**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **25-453-MAK** |
| **vs.** | : | |
| | : | |
| **CLIFT SEFERLIS** | : | |

<u>**SENTENCING MEMORANDUM OF DEFENDANT CLIFT SEFERLIS**</u>

## I.  INTRODUCTION

This is an unusually perplexing and difficult case. The Court must impose sentence for conduct that was deeply hurtful and alarming and understandably caused real fear and disruption, yet that conduct is sharply juxtaposed with a defendant whose life has otherwise been defined by peaceful behavior, sustained volunteerism, civic responsibility, and a commitment to tolerance, acceptance, and understanding. For decades, Clift Andrus Seferlis (Mr. Seferlis) has been culturally engaged, community-oriented, and consistently respectful of others across backgrounds and beliefs. This sentencing memorandum asks the Court to hold both truths together: that the offense was serious and deserving of punishment, and that Mr. Seferlis is a non-violent, non-hateful individual whose conduct was aberrational and whose history, characteristics, and remorse warrant a sentence that is firm, proportionate, and oriented toward rehabilitation rather than excess. After considering the advisory Guidelines range and all of the factors set forth in 18 U.S.C. § 3553(a), Mr. Seferlis respectfully submits that a non-custodial sentence is "sufficient, but not greater than necessary," to achieve the purposes of sentencing.

## II.  PROCEDURAL HISTORY

Mr. Seferlis was arrested by way of criminal complaint on June 16, 2025, in the District of Maryland. Following an initial appearance in D. Md. he was released on conditions and the next

day appeared in this district and was again released on conditions, including home detention and location monitoring.  Mr. Seferlis has complied with all conditions of pretrial release.

Mr. Seferlis' arrest followed the execution of search warrants on his residence, his vehicle, and his husband's primary residence. During execution of those warrants, Mr. Seferlis was present, cooperative with law enforcement and voluntarily made admissions concerning the charged conduct.

On October 14, 2025, Mr. Seferlis was charged by way of Information with:

- Mailing threatening communications, in violation of 18 U.S.C. §876(c) (Counts 1–17);
- Obstruction of the free exercise of religious beliefs, in violation of 18 U.S.C. §247(a)(2) and (d)(5) (Counts 18–20 and 25);
- Obstruction of the free exercise of religious beliefs, in violation of 18 U.S.C. §247(a)(2) and (d)(3) (Counts 21-24).

On November 17, 2025, Mr. Seferlis waived indictment, and entered a plea of guilty to Counts 1 through 25 pursuant to a written plea agreement with the Government. As part of that agreement, Mr. Seferlis waived venue as to conduct occurring outside the Eastern District of Pennsylvania and consented to prosecution of all charged offenses in this District. In exchange, the Government agreed that it would not initiate any additional federal prosecutions in this District based on the conduct known to it at the time of the plea agreement. The Government further represented that the Department of Justice, Civil Rights Division would not pursue additional charges in any other district arising from the same conduct, provided that Mr. Seferlis fully complies with his obligations under the plea agreement.

## III.    THE NEW TWO-STEP SENTENCING PROCESS UNDER THE 2025 GUIDELINES MANUAL

On November 1, 2025, the United States Sentencing Commission implemented a major structural revision to the Guidelines Manual, expressly reorganizing it to reflect what the Supreme Court has required since *United States v. Booker*, 543 U.S. 220 (2005): that federal sentencing

consists of two analytically distinct steps, and that the Guidelines are only the first step in a broader inquiry governed by 18 U.S.C. § 3553(a). The Commission's new Introductory Commentary makes clear that the 2025 Guidelines Manual is designed not as a prescriptive sentencing code but as a framework subject to the primacy of the statutory "parsimony principle" - a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing. See USSG Ch.1, Pt. A. intro. comment.

The Introduction states: "The Guidelines Manual is structured to reflect the advisory sentencing scheme established following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), recognizing both essential steps of the court's inquiry in imposing a sentence 'sufficient, but not greater than necessary.'… The guidelines and policy statements… represent the first step in the sentencing process and are one of multiple factors judges must consider under 18 U.S.C. § 3553(a)." USSG, Ch.1, Pt. A. intro. comment.

This structural revision is not merely cosmetic. It codifies nearly two decades of Supreme Court jurisprudence emphasizing that the Guidelines, while still the "starting point," no longer predominate in the selection of the appropriate sentence. The revised Manual thus reinforces that sentencing courts are obligated to perform two separate tasks:

### A.    Step One: Properly Calculate the Advisory Guideline Range

The first step is unchanged: the district court must begin by correctly calculating the advisory guideline range. *Booker* held that this calculation remains a mandatory component of sentencing procedure, even though the Guidelines themselves are not binding. *Booker*, 543 U.S. at 264. As the Background to §1B1.1 explains: "District courts are first required to properly calculate and consider the guidelines when sentencing.… 'The district courts, while not bound to

apply the Guidelines, must... take them into account when sentencing.'" USSG §1B1.1, comment. (backg'd), citing *Booker*, 543 U.S. at 264.

The Supreme Court has repeatedly reaffirmed this requirement:

- *Gall v. United States,* 552 U.S. 38, 49 (2007*)* (citing *Rita v. United States*, 551 U.S. 338, 347-348(2007): "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."
- *Gall v. United States*, 552 U.S. 38, 49 (2007): "[t]he Guidelines are the "starting point and initial benchmark."
- *Peugh v. United States*, 569 U.S. 530, 541–42 (2013): "the federal system adopts procedural measures intended to make the Guidelines the 'lodestone' of sentencing."

The 2025 Manual continues to require that the court calculate the Base Offense Level, apply any Chapter Two and Three adjustments, determine the criminal-history score, apply any statutory constraints, and determine the final advisory range. See USSG §1B1.1(a).

### B.    Step Two: Independently Apply § 3553(a) to Determine the Sentence That Is "Sufficient, but Not Greater Than Necessary"

Once the advisory range is calculated, the court must then proceed to the second, statutorily mandated step: the application of the § 3553(a) factors to determine the sentence that satisfies the parsimony principle. As §1B1.1's Background now states: "District courts are then required to fully and carefully consider the additional factors set forth in 18 U.S.C. § 3553(a)... Step two... reflects this step of the sentencing process." USSG §1B1.1 comment. (backg'd).

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

(a)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(b)    to afford adequate deterrence to criminal conduct;
(c)    to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, any pertinent policy statement, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  See 18 U.S.C. §3553(a).

In exercising its sentencing discretion, the court is ultimately guided by the statutory factors, rather than being bound by the Guidelines. The Guidelines are "one factor among several." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

The 2025 revisions formalize this by restructuring the Manual to place the Guideline calculation in Step One and the §3553(a) analysis in Step Two, reinforcing what has long been true: the correct sentence is the one that is individualized, holistic, and not driven mechanically by the Guidelines grid.

### C.    The Elimination of Departures and the Reaffirmation of Individualized Sentencing

One of the most significant 2025 changes is the removal of all "departure" provisions from Chapters Four and Five.[1] Historically, the Guidelines included dozens of "departure" mechanisms, that allowed a court to impose a sentence outside the guideline range before turning to §3553(a). But after *Booker*, courts largely abandoned departures in favor of "variances," which arise from the §3553(a) analysis itself.

The Commission explained: "[i]n 2025, the Commission amended the Guidelines Manual to remove departures… to better align the requirements placed on the court and acknowledge the

---

[1] The sole exception is the remaining portion of §5K1.1, which no longer employs the term "departure," but instead authorizes a "reduction" resulting in "a sentence below the otherwise applicable guideline range."  USSG §5K1.1

growing shift away from the use of departures… The Commission envisioned and framed this 2025 amendment to be outcome neutral… [J]udges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts… as a variance under 18 U.S.C. §3553(a)."  USSG, Ch.1, Pt. A. intro. comment.

"The removal of departures… does not limit the information courts may consider in imposing a sentence nor does it reflect a view… that such facts should no longer inform a court." The Commission is explicitly acknowledging that:

- *all* formerly departure-eligible circumstances remain fully cognizable under § 3553(a);
- the sentencing court may consider any relevant, reliable information, including information about the defendant's health, family responsibilities, substance-abuse history, trauma, lack of criminal history, aberrant conduct, and other individualized factors – even if they were previously "discouraged" or "not ordinarily relevant";
- the decision whether and how to vary from the advisory range lies squarely within the district court's discretion, guided by §3553(a)'s statutory command, not by any "departure" rubric.

See 18 U.S.C. §3553(a) (setting forth the statutory framework requiring an individualized sentence that is "sufficient, but not greater than necessary"), 18 U.S.C. §3661 ("[n]o limitation shall be placed on the information" a court may consider at sentencing); *United States v. Booker*, 543 U.S. 220, 245–46 (2005) (holding Guidelines advisory and restoring full judicial discretion to consider all §3553(a) factors when selecting a sentence); *Gall v. United States*, 552 U.S. 38, 49–50, 57 (2007) (the Guidelines are the "starting point," but district courts must tailor sentences to the defendant; variances may rest on individualized factors and need not be tied to Guideline departures); *Rita v. United States*, 551 U.S. 338, 351 (2007) (sentencing courts must begin with the correct Guideline range but then conduct an independent, individualized assessment under §3553(a)); *Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007) (courts may vary based on policy disagreements with the Guidelines as well as individualized factors; the Guidelines do not bind the court's discretion); *Pepper v. United States*, 562 U.S. 476, 489–91 (2011) (sentencing

judges may consider the "widest possible breadth of information" about the defendant, including personal history, rehabilitation, trauma, and other individualized factors; §3661 bars limitations on information considered at sentencing); *Nelson v. United States*, 555 U.S. 350, 351 (2009) (the Guideline range cannot be presumed reasonable; courts must make an independent determination under §3553(a)); *Peugh v. United States*, 569 U.S. 530, 541–42 (2013) (even in the advisory regime, the Guidelines remain only the "lodestone" and starting point; ultimate sentence must be justified by § 3553(a)); USSG, Ch.1, Pt. A. intro. comment. (eliminating departures; explaining that the amendment is "outcome neutral"; and expressly stating that facts formerly supporting departures remain fully available to courts as variances under § 3553(a), and that removal of departures "does not limit the information courts may consider").

By placing all mitigation analysis under §3553(a), the 2025 Manual restores sentencing to what Congress intended in the Sentencing Reform Act: an individualized process in which judges weigh all relevant facts to reach a fair, just, and parsimonious sentence.

### D. The Guidelines Inform; § 3553(a) Decides

The result of these reforms is a sentencing structure that is more transparent, more coherent, and more aligned with controlling Supreme Court authority. The Guidelines calculation remains important, indeed, required, but its role is only one part of a broader, individualized analysis.

The Commission emphasizes that sentencing courts remain free to consider the full universe of mitigating information, noting that the 2025 amendments "do[es]not limit" what courts may consider. This reinforces that the Guideline range acts as a reference point; §3553(a) governs the ultimate sentence; and individualized justice, not grid-driven uniformity, is the touchstone of the post-Booker sentencing system.

In short, the 2025 Guidelines Manual reflects a sentencing system that is consistent with what the Supreme Court envisioned: a system in which the court uses the Guidelines as a starting point, but where the final sentence is driven by human facts, individual circumstances, and the statutory parsimony principle.

## IV.    DETERMINING CLIFT SEFERLIS' SENTENCE UNDER THE NEW TWO-STEP PROCESS

### A.    MR. SEFERLIS' GUIDELINE CALCULATION

The Presentence Investigation Report ("PSR") calculates the advisory guideline range as follows:

Pursuant to USSG§3D1.2(a) and (b), and §2A6.1, Application Note 3, the PSR grouped counts involving threatening communications to the same victim and treated counts involving different victims as separate groups. The counts were grouped by institution as follows:

- Group I: Jewish Institution No. 1: Counts 1, 6, 18, and 19
- Group II: Jewish Institution No. 2: Counts 2, 3, 5, 10, 11, and 13
- Group IV: Jewish Institution No. 4: Counts 7 and 22
- Group VI: Jewish Institution No. 6: Counts 9 and 24
- Group VIII: Jewish Institution No. 8: Counts 14 and 15
- Group X: Jewish Institution No. 10: Counts 17 and 25

The following counts were treated as separate groups because they involved distinct victims and separate conduct:

- Group III: Jewish Institution No. 3: Count 4
- Group V: Jewish Institution No. 5: Count 8
- Group VII: Jewish Institution No. 7: Count 12
- Group IX: Jewish Institution No. 9: Count 16
- Group XI: Jewish Institution No. 11: Count 20
- Group XII: Jewish Institution No. 12: Count 21
- Group XIII: Jewish Institution No. 14: Count 23.

In total, the PSR identified thirteen separate groups. (PSR¶64). For each group, the PSR applied a base offense level of 12 pursuant to USSG §2A6.1. For the group involving Institution

No. 2, the PSR applied a two-level enhancement under §2A6.1(b) because six separate threatening communications were sent to that victim. The PSR further applied a three-level victim-related adjustment pursuant to §3A1.1(a), concluding that Mr. Seferlis intentionally selected the victims based on their actual or perceived religion. The highest adjusted offense level was 17 (Group II, Jewish Institution No. 2) (PSR¶71-76).

Applying the multiple-count adjustment under §3D1.4, the PSR calculated thirteen units, resulting in a five-level increase and a combined adjusted offense level of 22. (PSR¶143-146). After a three-level reduction for acceptance of responsibility under §3E1.1(a) and (b), the total offense level is 19. (PSR¶148-150). Mr. Seferlis has zero criminal history points, placing him in Criminal History Category I. (PSR¶135-154).  Based on Offense Level 19 and Criminal History Category I, the advisory guideline range of imprisonment is 30 to 37 months. (PSR¶205)

Mr. Seferlis agrees with the guideline calculation of 30-37 months set forth in the PSR. But the calculation of the advisory range is not the end of the sentencing inquiry.

## B.     APPLICATION OF THE §3553(a) FACTORS TO CLIFT SEFERLIS

### 1. Nature and Circumstance of the Offense

There is no dispute that the communications at issue were offensive, alarming, and unacceptable.  Over the course of roughly sixteen months, Mr. Seferlis sent at least 40 letters and two postcards to more than twenty-five Jewish organizations and in many instances the letters were addressed to specific individuals.

Mr. Seferlis, known as "Andy" to some of his earliest childhood friends and "Clift" to most of his adulthood friends and colleagues, acknowledges that the letters contained highly inflammatory language and derogatory monikers historically used to demean Jewish people and further concedes he referenced some of the most horrific events in Jewish history, including

Kristallnacht and allusions to "broken glass," thereby invoking imagery deeply associated with persecution and violence.

*a.    Contextual Background and Triggering Events*

Mr. Seferlis' conduct was appalling and truly reprehensible. Mr. Seferlis acknowledges this without hesitation. No argument herein should be interpreted by this Court as Mr. Seferlis making excuses, shying away from his actions or their impact on the victims. Mr. Seferlis does not seek to excuse the language used or the trauma and distress caused to the individuals and institutions that received the letters. Rather, this section is offered to explain why this otherwise law-abiding individual engaged in conduct that is wholly inconsistent with the life he has led and the values he has demonstrated over decades.

Mr. Seferlis' conduct did not arise from a pattern of hatred, criminality, or ideological extremism. Instead, it was the product of an acute emotional reaction to a rapidly unfolding international crisis, coupled with Mr. Seferlis' inability, during the conduct timeframe, to process or regulate his response in a constructive manner.

In the aftermath of the October 7th attacks and the ensuing military response in Gaza, Mr. Seferlis became consumed by a sense of moral outrage, helplessness, and despair. He perceived the scale of civilian suffering, particularly among Palestinians, as profoundly unjust and felt that global political discourse failed to adequately acknowledge or address that suffering. This emotional response was not filtered through reasoned political advocacy or lawful protest, but instead manifested in impulsive, reckless communications that crossed clear legal and moral boundaries.

###### b.    Mr. Seferlis' Political Emotion Is Not Racial or Religious Hatred

Mr. Seferlis' conduct must be understood as political rage misdirected, not religious or ethnic hatred embraced. Mr. Seferlis does not harbor animus toward Jewish people as a group, nor does he subscribe to antisemitic ideology. His life history reflects no prior statements, conduct, or associations consistent with hatred of Jews or any other protected class. To the contrary, his professional life, as a stone carver, architectural historian, and licensed tour guide, has involved the preservation, explanation, and celebration of historical and cultural sites across communities and traditions.

The racial references invoked in the charged communications, including historically loaded language, were not reflective of deeply held beliefs but of an inflammatory political moment in which Mr. Seferlis reacted emotionally and irresponsibly to events he viewed through a moral and humanitarian lens. That reaction was clearly wrong, but it was not rooted in a worldview of hate. The context matters, particularly where speech, however reprehensible, reflects a transient emotional upheaval rather than an entrenched ideological commitment.

###### c.    Mr. Seferlis' Absence of Intent or Capability to Follow-Through

There is absolutely no evidence that Mr. Seferlis ever intended to carry out any act of violence. During his interview with the agents, Mr. Seferlis unequivocally stated as such and the Government cannot dispute that. There was no planning, no acquisition of weapons, no surveillance, no travel, and no steps taken toward execution of any threat. The communications were not accompanied by any conduct suggesting operational intent. This distinction is critical for sentencing purposes. While threatening language alone is serious and deserving of sanction, the absence of intent to act or capacity to act significantly mitigates the risk the defendant poses to the public. The offense reflects extremely reckless and hurtful speech, not violent predisposition.

### d.    A Profoundly Aberrant Act in an Otherwise Law-Abiding Life

This case represents a sharp and singular deviation from a life otherwise marked by lawful conduct, steady employment, and civic engagement. Mr. Seferlis has no prior contact with the criminal justice system. He has lived as a productive member of society, supporting himself through skilled labor and educational work, and contributing to the preservation of shared cultural history.

The events underlying this conviction are not predictive of future conduct. They are instead emblematic of a moment in which political anguish overwhelmed judgment, a moment for which Mr. Seferlis has expressed genuine remorse and from which he has learned hard and lasting lessons.

### e.    Acknowledgment of Harm and Impact on the Community

Mr. Seferlis does not minimize the seriousness of the offense conduct or the harm it caused. Threats directed at synagogues, museums, and other Jewish institutions strike at places that are not only houses of worship and centers of culture, but also symbols of safety, identity, and communal continuity. In the present political climate, where antisemitic violence is not theoretical but tragically real, such threats predictably instill fear, disrupt daily life, and force institutions to divert resources toward security rather than their core missions.

The Court need not speculate about the impact of this conduct. Institutions that received the communications were compelled to treat them as credible until proven otherwise. Staff, congregants, and visitors were placed in a position of uncertainty and anxiety. These harms exist regardless of Mr. Seferlis' subjective intent, and the defense acknowledges them without reservation.

Mr. Seferlis himself now understands that the language he used, particularly references invoking historical violence against Jews, carried a weight far beyond what he appreciated at the time. Those references are inseparable from a collective memory of persecution and mass violence, and their invocation understandably amplified fear and distress. That impact is real, and it is not diminished by the absence of intent to carry out the threats.

This acknowledgment was not developed after the fact. When agents arrived at Mr. Seferlis' husband's home to execute a search warrant there, he was fully cooperative. Agents advised him that he was free to leave and that any statement he made would be voluntary, yet he nonetheless engaged in a lengthy and candid conversation with the agents. He immediately acknowledged that the typewriter about which agents inquired was located in his home and explained that he had purchased it approximately a year and a half earlier. During the interview, he spoke openly about the emotional impact that images from Gaza had on him and acknowledged that the recent shooting of a couple in Washington, D.C. was horrific. He unequivocally stated that he had no intention of acting on the letters and recognized that his conduct risked compounding fear during an already fraught period. He further admitted that he knew he had evoked strong emotions and that references such as Kristallnacht would predictably instill fear, expressing shame for having used historically charged language. He acknowledged that there are limits to protected speech and conceded that he deliberately employed monikers and triggers that were hurtful. These admissions, made voluntarily and contemporaneously with the execution of the warrant, reflect candor and insight that bear directly on his acceptance of responsibility.

At the same time, acknowledgment of harm is not incompatible with recognition of context. The fact that the conduct caused genuine fear does not transform Mr. Seferlis into someone motivated by enduring hatred or violent ideology. Both propositions can, and do, coexist: the harm

was significant, and the conduct was wrong; yet it was also aberrational, impulsive, and disconnected from any plan to inflict physical violence.

Mr. Seferlis accepts responsibility for the fear he caused and does not seek to shift blame to political events, emotional distress, or global conflict. Those factors explain the circumstances under which the offense occurred; they do not excuse it. His remorse is grounded not merely in the legal consequences he faces, but in the recognition that his words inflicted real harm on a community already bearing the weight of historical trauma.

For sentencing purposes, this candid acknowledgment underscores that accountability has already begun and that Mr. Seferlis is not a continuing threat to the safety of the community.

**2. History and Characteristics of Clift Seferlis**

*a. Family, Education, Employment, Volunteerism*

Mr. Seferlis' history and characteristics reflect a life defined by kindness, cultural engagement, service, intellectual curiosity, and deep ties to community and faith. These qualities stand in stark contrast to the offense conduct at issue.

Mr. Seferlis was raised by parents of markedly diverse backgrounds. His father, the son of a farmer born in Sparta, Greece, immigrated to the United States in 1957 and became an accomplished sculptor and stone carver, earning induction into the National Sculpture Society and the National Academy of Design. His artistic legacy includes works on the U.S. Capitol, the Smithsonian Castle, the National Shrine of the Immaculate Conception, and the National Cathedral, along with numerous private commissions.[2]

---

[2] https://www.washingtonpost.com/archive/local/2005/04/03/cathedral-sculptor-constantine-l-seferlis-dies/e12ea2dd-d16b-4227-85fa-43025b13164b/



His mother, born in Hawaii and the daughter of a Major General in the United States Army, worked at *The Washington Post* before devoting significant time to the Cathedral Schools attended by Mr. Seferlis and his brother. Both parents are now deceased. Mr. Seferlis was a caretaker of both his parents when they fell ill at different times. First, his mother in his sophomore year of high school became critically ill as the result of choking. She suffered loss of oxygen and blood to the brain, resulting in ataxia. She ultimately died of emphysema. Mr. Seferlis was his father's caretaker who suffered from and died of Parkinsons. Mr. Seferlis' only brother was exceptionally gifted academically but struggled with severe alcoholism and died prematurely in 2009. His brother's death has had a profound and lasting impact on Mr. Seferlis. With the passing of his parents and brother, Mr. Seferlis has no close living relatives.

Mr. Seferlis grew up in the Washington metropolitan area, though the family home was technically located in Maryland. He spent summers in Maine, where he now maintains a family property that he rents as a source of income. Those summers were formative. For nearly three months each year, his parents took him and his brother to that home, where the rhythms of daily life centered around the outdoors and the quiet ritual of watching the sunrise and sunset. He credits those experiences with shaping his professional and personal identity. Even now, he remains

---

[3] Mr. Seferlis and his father doing repair at the Smithsonian Castle.

deeply grateful to have that home as a place of retreat and reflection and a place to gather with friends in the tranquility of nature.



After briefly attending Cornell University and Drexel University, Mr. Seferlis transferred to and earned his degree from New York University. From there, he devoted his adult life to work that integrates history, preservation, craftsmanship, and public education.

He followed his father into the stone-carving and restoration trade [5] while simultaneously building a career in cultural and historical tourism. In the preservation field, he has taught seminars, instructed students, and volunteered extensively, estimating that approximately forty percent of his time over the years has been devoted to unpaid service. Before the charges in this case, he divided his time among teaching carving classes, supervising monument restoration at Oak Hill Cemetery, and participating in academic and preservation discussions through the Landmarks Committee of the D.C. Preservation League and the Cathedral community.

---

[4] Mr. Seferlis' family cabin and property in Maine.
[5] https://washingtonian.com/2023/11/10/meet-the-guy-keeping-the-craft-of-stone-carving-alive-and-well-in-dc/


6


7


8


9

His professional history reflects sustained commitment to education and historic preservation. He worked as an independent contractor for the Smithsonian Institution alongside his father on restoration of the Castle building and has performed stone-carving and preservation work for Hillwood Museum, Oak Hill Cemetery, and the General Services Administration at the ATF headquarters in Washington, D.C. He is a certified Jahn restoration mortar specialist and has dedicated much of his career to teaching and preserving traditional stone carving techniques. He has served as an adjunct faculty member teaching stone carving at the Washington Waldorf School and in Maine at River Arts, where he has served as a board member and instructor for over twenty years. His craftsmanship has been recognized through his selection as an exhibitor at the Smithsonian Folklife Festival and the National Building Museum's Festival of the Building Arts.

---

[6] Mr. Seferlis working at his trade.
[7] Monument crafted by Mr. Seferlis in Oak Hill Cemetery.
[8] Oak Hill Cemetery volunteer restoration.
[9] Stone carving seminar at Oak Hill Cemetery.

In parallel, Mr. Seferlis built a respected career in tourism. He is a licensed tour guide in Washington, D.C. and New York City and has worked with numerous tour operators, including Junior Tours, Things To Do DC, and Capital Services LLC. He is a co-founder of Washington Walks and, in 2018, founded Capitol Spaces, LLC, through which he continues to provide historical and educational tour services. His passion for guiding is rooted not merely in historical knowledge, but in walking through architectural, civic, and sacred spaces and helping others see their meaning.



[10]



[11]

---

[10] Three bus tour move of 10th to 12th graders performing at the Lincoln Memorial.
[11] Leading a tour through the Gettysburg battlefield.



12



13

He has also served on the boards of numerous nonprofit and preservation-focused

organizations, including the D.C. Preservation League Landmarks Committee, the Latrobe

---

12 "Behind the scenes" and "tower climb" tour.
13 Philadelphia tour with Fort Worth Texas Middle School.

Chapter of Architectural Historians, River Arts Maine, the Oak Hill Cemetery Preservation Board, the Guild of Professional Tour Guides, and the City Tavern Preservation Foundation, where he was elected president in 2025. These roles reflect long-standing civic engagement and stewardship of shared cultural spaces.

Outside of his formal work, Mr. Seferlis' intellectual and personal pursuits reinforce the same themes of structure, aesthetics, and engagement with the physical world. He is an avid reader with an extensive personal library, approximately ninety percent of which concerns architecture, historic properties, preservation techniques, and guidebooks. He is passionate about classical music but also retains affection for the house music he enjoyed during college.

He prefers to be outdoors whenever possible. When not working, he is biking, hiking, or kayaking and makes a conscious effort not to miss a sunrise or sunset. He has long been interested in landscaping and the science of plants and flowers, and during the pandemic volunteered with the chief groundskeeper at Oak Hill Cemetery. He is also an avid photographer and continues to use professional cameras to provide carefully composed images for Capitol Spaces' public materials.

He also has an enduring appreciation for wit and lighthearted expression, including *Garfield*, *The Far Side*, and collections from *The New Yorker*. That sense of humor sits alongside his broader engagement with art, music, architecture, craftsmanship, and nature.

Taken together, these varied pursuits reflect a person whose life has never been confined to a single discipline or interest. In that respect, Mr. Seferlis is something of a renaissance figure - deeply engaged with history, art, craftsmanship, horticulture, music, photography, and human connection, yet largely disconnected from modern digital culture. His life is rooted in tangible

spaces, traditional forms of communication, and lived community engagement rather than online discourse.

He is particularly comfortable within the elder community and has served as power of attorney for more than one elderly couple without children in his community. He anticipates serving as health advocate for a dear older friend who lives alone without family support. These responsibilities require trust, steadiness, and reliability.

Mr. Seferlis' religious life further reflects the values that have shaped him. Raised Greek Orthodox, he has long been active in the Episcopal tradition and regularly attends Evensong services at the National Cathedral and similar services in New York. He also participates in Taizé and monthly Vespers services.

Mr. Seferlis has been in a committed relationship with his husband for nearly twenty years, and the couple married in 2025. Although they maintain separate residences, they have long shared their lives by spending time between both homes, a routine substantially restricted by the conditions of release. His husband remains supportive and is attempting to reconcile the conduct at issue with the man he has known for decades to be kind and principled.

Mr. Seferlis places particular value on traditional written communication and the United States mail. While most children aspire to become doctors or astronauts, as he explained to agents during his pre-arrest interview, he wanted to become the Postmaster General. That childhood aspiration was not casual; it reflected a longstanding fascination with the postal system as a means of structured, intentional communication. To this day, he spends large sums annually on postage, sending personal notes and postcards to current and former clients, families, and friends. While this context does not excuse the conduct, it helps explain how his distress manifested through mailed correspondence rather than digital platforms.

Taken as a whole, Mr. Seferlis' life reflects decades of sustained compassion, cultural stewardship, intellectual engagement, and service to others. The record before the Court is not one of isolation, extremism, or hostility toward others, but of teaching, mentoring, restoring, guiding, volunteering, worshipping, and maintaining enduring relationships across communities and faith traditions.

### b. Character Letters

The portrait of Mr. Seferlis presented here is not self-described, nor constructed for mitigation. It emerges independently from decades of lived experience offered by neighbors, colleagues, clergy, lifelong friends, professionals, and a law enforcement officer. Across over twenty letters, written by individuals who have known him for periods ranging from five to over fifty years, the themes are strikingly uniform: gentleness, intellectual curiosity, inclusivity, service to others, and the absence of hostility or violence.

The consistency of these accounts, across different settings, professions, and religious communities, underscores a central point: the conduct before the Court is a marked deviation from a lifetime pattern of behavior.

### i. Absence of Violence or Animus

Multiple writers emphasize that they have never observed Mr. Seferlis engage in aggression, hatred, or divisiveness of any kind. John Sullivan, a former D.C. Police Department officer, who has known Mr. Seferlis since nursery school and continued alongside him through middle school and high school, writes that in more than fifty years he has "never seen [him] engage in even a verbal argument, much less a physical altercation." He describes himself as "stunned" by the conduct at issue because it does not resemble the person he has known for decades. (Exhibit

1). He further states that he has never heard Mr. Seferlis express division along lines of "race, gender, or religion" and is confident that violence "is just not in him." Id.

Patricia Byrne, an attorney, who has known Mr. Seferlis for over twenty-five years, likewise reports that she has never heard him express anti-Semitic or racist sentiments and has never seen anything suggesting he is violent or likely to physically harm another person. (Exhibit 2).

Jane A. Tipton, Mr. Seferlis' Maine neighbor of more than thirty years and a Licensed Clinical Social Worker who described herself as "a good judge of a person's character," wrote that Mr. Seferlis is "among the least antisemitic and violent people I know" and that the conduct underlying this case is "completely inconsistent with his past behavior." (Exhibit 23).

Jill S. Lillianthl, a longtime colleague and member of the Jewish faith, recounts welcoming Mr. Seferlis into her home for Shabbat dinners and religious celebrations over many years without hesitation or discomfort. (Exhibit 3). Ian Sanchez, another colleague, writes that he has never heard Mr. Seferlis make derogatory remarks regarding ethnicity or religion, describing him instead as "compassionate, inclusive, and deeply respectful to all people." (Exhibit 4).

Across decades of observation, none of these individuals describe hostility, hatred, or violent tendencies. Instead, they uniformly describe the opposite.

*ii. Service, Mentorship, and Professional Conduct*

A second consistent theme is Mr. Seferlis' longstanding role as an educator and mentor. Colleagues in the touring profession describe him as widely respected and generous with his knowledge. Debra Siploa, who first met him when he served as a tour guide for her eighth-grade class, recalls not only his command of subject matter but also "the compassion, kindness, and interest he showed everyone." (Exhibit 5).   Tamara W. Belden describes him as "a widely

respected and beloved member of the tour guide community." (Exhibit 6).  Rosemarie Russo notes that teachers and students remain in contact with him long after their tours conclude. (Exhibit 7).

Mathilde Grant, who has known him since adolescence, describes him as "deeply curious about the world and eager to share what he learns with others." (Exhibit 8).

These accounts depict a professional life defined by intellectual engagement, mentorship, and sustained positive relationships, not isolation or animus.

### iii.     Quiet, Sustained Acts of Care

The letters also describe a pattern of quiet, practical care toward others. Neighbors recount decades of checking on elderly residents, assisting with moves to assisted living, and delivering handwritten cards and photographs without prompting. (Exhibits 9, 10, 11, 12). Brian Ketcham writes that the steady arrival of thoughtful cards and letters "speak volumes about the person he is when no one is watching."  These are not isolated anecdotes. They describe daily conduct repeated over years. (Exhibit 13).

### iv.     Risk Perspectives

Several writers bring professional experience relevant to assessing character and risk. William Billow, Chaplain Emeritus of St. Alban's School, characterizes the conduct before the Court as "an aberration of character." (Exhibit 14). Carolyn Shawaker, a former mayor of Montgomery County, Maryland and former educator within the Bureau of Prisons, knows Mr. Seferlis to be helpful to an elderly woman in the community, opines that neither Mr. Seferlis nor society would benefit from his incarceration and describes him as a "decent soul with many good qualities." (Exhibit 15).

Most notably, Mr. Sullivan, the former D.C. Police Department officer who has known Mr. Seferlis for over fifty years, expresses professional and personal confidence that Mr. Seferlis poses little risk of engaging in similar conduct again. (Exhibit 1).

*v.    Recognition and Remorse*

The letters do not minimize the seriousness of the offense. Several letters expressly acknowledge awareness of the charges, the harm caused and have discussed the conduct with Mr. Seferlis, who has expressed deep remorse and regret for his actions.

Mr. Sullivan reports that Mr. Seferlis is "painfully aware" of how deeply he transgressed and how profoundly sorry he is for causing fear and harm. (Exhibit 1). Mr. Ketcham, aware of the offense conduct, states that the conduct "does not reflect the man I've known for the past 15 years" and expresses confidence that he will "spend the rest of his life trying to make things right." (Exhibit 13).

The complete letters referenced above are attached as exhibits as follows:

- Exhibit 1 – John Sullivn, D.C. police officer, friend since childhood
- Exhibit 2 – Patricia Byrne, attorney and friend of 25 years
- Exhibit 3 – Jill Lillianthal, colleague and friend of 21 years
- Exhibit 4 – Ian Sanchez, colleague for 5 years
- Exhibit 5 – Debra Sipola, colleague over 20 years
- Exhibit 6 – Tamara Belden, colleague and friend over 20 years
- Exhibit 7 – Rosemarie Russo, colleague over 15 years
- Exhibit 8 – Mathilde Grant, high school friend over 40 years
- Exhibit 9 – Alice de Mauriac, neighbor and friend over 13 years
- Exhibit 10 – Erik Grosof, National Transportation Safety Board, friend over 20 years
- Exhibit 11 – Robin Daly, neighbor of 25 years
- Exhibit 12 – Ellen Patterson, childhood neighbor
- Exhibit 13 – Brian Ketcham, colleague and friend over 15 years
- Exhibit 14 – William Billow, Chaplain Emeritus of St. Albans School
- Exhibit 15 – Carolyn Shawaker, former Mayor and BOP teacher, friend since childhood
- Exhibit 16 – Anne Cowan, colleague and friend over 20 years
- Exhibit 17 – Edward Shawaker, neighbor over 40 years
- Exhibit 18 – Gilbert Carmichael, friend since high school
- Exhibit 19 – James Lee, colleague and friend over 20 years

- Exhibit 20 – Jim Carr, Colonel, U.S. Army (retired), friend over 20 years
- Exhibit 21 – J. Taylor Hasty, colleague and friend over 10 years
- Exhibit 22 – Mike Stitt, colleague and friend over 12 years
- Exhibit 23 – Jane A. Tipton, Maine neighbor for over 30 years
- Exhibit 24 – Andrea Carmichael, friend and mother of childhood friend
- Exhibit 25 – Adam Patcher, friend since childhood
- Exhibit 26 – Micheal Lawrence, friend of over 30 years
- Exhibit 27 – Rolando Garcia, partner/husband, 25 years
- Exhibit 28 – Bette Runck, neighbor, 45 years
- Exhibit 29 – George A. Albany, IV, colleague and friend, 10 years

Taken together, these letters present a decades-long, consistent record of nonviolence, inclusivity, mentorship, and quiet service. The uniformity of these accounts, spanning more than half a century and offered by individuals with no incentive to exaggerate, support the conclusion that the offense conduct represents an aberrational departure from Mr. Seferlis' established character, not a predictor of future danger.

### c. Neuropsychological Evaluation and Risk Assessment

Dr. Mark Gramtages conducted a comprehensive neuropsychological evaluation of Mr. Seferlis using widely accepted, standardized clinical and forensic assessment instruments. In practical terms, these tests measure how an individual thinks, processes information, regulates emotions, exercises judgment, controls impulses, and functions in daily life. They also assess mood symptoms, personality traits, intellectual ability, academic functioning, and empirically validated risk factors associated with criminal behavior. Taken together, this evaluation provides an objective, science-based picture of cognitive functioning, psychological health, decision-making capacity, and treatment needs. A complete itemization of the specific instruments administered appears in Dr. Gramatges' report. (Dr. Gramatges Report Exhibit 30, Dr. Gramatges CV Exhibit 31).

### i.    Clinical Observations and Validity

Based on his examination, Dr. Gramatges concluded that Mr. Seferlis' "mental status was intact," with "insight and judgment" likewise intact. His mood was described as "stressed with congruent affect." Dr. Gramatges further concluded that the testing results represent a valid assessment of Mr. Seferlis' current neurological functioning. (Exhibit 30 at 5).

ii.    *Risk Assessment Findings*

Formal risk assessment revealed a "very low overall risk/need." Mr. Seferlis was rated at very low risk across all major criminogenic domains, including criminal history, education and employment, family and marital functioning, leisure activities, peer associations, substance abuse, pro-criminal attitudes, and antisocial patterns. (Exhibit 30 at 9).

Measures of psychopathic traits placed Mr. Seferlis within the range of an average community population, with no elevations in antisocial, affective, or interpersonal dimensions. Although lifestyle factors reflected some sensation seeking, impulsiveness, and a tendency not to fully consider consequences, Dr. Gramatges noted the absence of broader psychopathic characteristics. (Id).

iii.    *Cognitive and Executive Functioning Findings*

Mr. Seferlis' overall intellectual and cognitive abilities were intact. Some memory concerns were noted, but the most significant findings involved executive functioning. Testing revealed uneven performance across abilities, with particular weaknesses in fluid reasoning, deductive reasoning, fluid intelligence, and simultaneous processing. Verbal and visual deductive reasoning fell at the first percentile, indicating marked difficulty with higher-order reasoning tasks. (Exhibit 30 at 6, 10, 11).

Executive functioning refers to the mental processes required for planning, organization, impulse control, behavioral regulation, and goal-directed activity. These functions are associated

primarily with the frontal lobes and include working memory, attention control, problem solving, time management, inhibition, and decision making. Impairment in this domain can interfere with the ability to organize tasks, follow complex sequences, adapt to changing circumstances, regulate emotional responses, and disengage from unproductive lines of thought. Dr. Gramatges also noted evidence of perseveration, meaning difficulty shifting away from a particular thought or course of action, consistent with executive dysfunction.

<em>iv.    MRI Findings</em>

In light of these concerns, an MRI of the brain was obtained. Imaging revealed areas described as "spots" or "scarring" in the upper portion of the brain. Dr. Gramatges concluded that, considered together with the neuropsychological findings, the MRI "indicates that something had occurred in Mr. Seferlis' past to cause these MRI changes along with the associated behaviors," although the precise cause cannot be determined from the available data. (Exhibit 30 at 4, 11 and Exhibit 32).

<em>v.    Significance in Relation to the Offense Conduct</em>

Dr. Gramatges emphasized that the conduct underlying the present charges appears to be an "anomaly" and "what can only be described as out of character," particularly for an individual with no prior criminogenic risk factors. He described such behavior as "highly unusual." He also observed that, given Mr. Seferlis' level of education, the communications at issue appeared "either rushed and/or poorly thought out," a pattern potentially consistent with executive functioning deficits. (Exhibit 30 at 11).

As to why Mr. Seferlis engaged in criminal conduct for the first time at age 54, Dr. Gramatges concluded there is no single definitive explanation. However, the combination of executive functioning impairment and objective MRI abnormalities suggests that "something

happened" in Mr. Seferlis' past that contributed to these changes, even though the precipitating event remains unknown. (Exhibit 30 at 11, 12).

<i>vi.      Current Risk, Remorse, and Rehabilitation</i>

Mr. Seferlis' behavior since the offense has stabilized. He has complied fully with all court requirements, presents as a low criminogenic risk, shows no significant psychopathy, and does not pose a danger to himself or others. He is actively engaged in psychotherapy and has expressed sincere remorse for the harm caused. Mr. Seferlis has articulated a desire to understand the factors that led to his conduct and to prevent any recurrence.

Dr. Gramatges suggests that public safety can be adequately protected through structured medical and psychological treatment. He recommends ongoing physical and mental health care, which is now feasible given Mr. Seferlis' comprehensive medical coverage and ability to coordinate treatment. Continued neurological monitoring is advised, including observation for potential cardiovascular issues or infections associated with a prior neurological event.  (Exhibit 30 at 12, 13).

Dr. Gramatges also identifies Mr. Seferlis' husband as a reliable support person capable of observing behavioral changes and facilitating prompt intervention. Psychologically, Dr. Gramatges recommends beginning with an intensive level of care, either a partial hospitalization program five days per week or a short-term residential program of approximately thirty days, to develop insight into the conduct and underlying motivations. Thereafter, continued individual psychotherapy using cognitive behavioral techniques and Acceptance and Commitment Therapy (ACT) is recommended to address stress, anxiety, and maladaptive thought patterns, along with mindfulness training to improve impulse control and decision making. (Id).

Mr. Seferlis has demonstrated insight into his actions, acknowledges prior poor judgment, and is motivated to engage in treatment. These factors substantially reduce the likelihood of future misconduct. Taken together, medical monitoring, intensive treatment, structured therapy, and strong family support provide a concrete framework to mitigate risk and protect the public going forward.

        d.       *Post-Offense Rehabilitation/Proposed 2026 U.S.S.G. Amendment*

The Sentencing Commission has proposed a new Chapter Three adjustment[14] to account for post-offense rehabilitation, reflecting its concern that the current Guidelines do not sufficiently recognize meaningful rehabilitative conduct undertaken prior to sentencing. Proposed §3E1.2 would permit a reduction of the offense level, where a defendant demonstrates positive post-offense behavior or rehabilitative efforts, including circumstances in which, as the Commission expressly provides, *"[t]he defendant completed or is successfully participating in counseling (e.g., mental health or anger management)."*

Applying that framework here, Mr. Seferlis has demonstrated sustained post-offense rehabilitation beginning immediately after the offense conduct. At the outset, he provided a full and complete statement to the agents on the scene, candidly admitting his conduct, accepting responsibility, and assisting law enforcement by identifying the location of the typewriter they were seeking. He also provided immediate access to his cell phone and computer by providing the agent his passcode. Thereafter, while on pretrial supervision, he engaged in regular therapeutic

---

[14]  The United States Sentencing Commission has recently proposed several amendments for the 2026 amendment cycle, including a new adjustment recognizing post-offense rehabilitation and proposed revisions to the sentencing table expanding the availability of non-custodial sentencing options (discussed *infra*). See U.S. Sent'g Comm'n, *Proposed Amendments to the Sentencing Guidelines* (Dec. 2025); U.S. Sent'g Comm'n, *Additional Proposed Amendments* (Jan. 30, 2026). https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202512_rf-proposed.pdf; https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202602_rf-proposed.pdf

counseling addressing the underlying issues relevant to this offense and has complied with the conditions of his pretrial release, including restrictive home detention. In addition, although at counsel's recommendation, he underwent and paid for Dr. Mark Gramatges' examination and report preparation. Moreover, he has maintained employment, although it has been somewhat curtailed by the publicity of the offense conduct.

Taken together, these efforts reflect purposeful, forward-looking rehabilitation of the type the Commission has identified as supporting consideration of a reduction in offense level if the proposed amendment were enacted. The Court may consider Mr. Seferlis post-arrest rehabilitation as persuasive evidence of his reduced risk of recidivism and as an independent basis for a variance under 18 U.S.C. § 3553(a).

### C. The Need for the Sentence Imposed to Promote Respect for the Law, Provide Just Punishment, Deter Future Conduct

The advisory Guidelines in this case call for a term of imprisonment of 30-37 months. While the advisory Guidelines are properly considered as one factor in the Court's two-step sentencing analysis, a sentence within that range would be greater than necessary to achieve the purposes of sentencing set forth in §3553(a).

The offense conduct is serious and warrants accountability. Threats directed at a religious institution, particularly during a period of heightened international tension and at a time when violence has in fact been carried out against Jewish individuals, including the recent killing of a couple in D.C., referenced in Mr. Seferlis' own correspondence, undermine public safety and must be addressed decisively. However, this conduct did not arise from a pattern of hatred, criminality, or ideological extremism. It was the product of an acute emotional reaction to a rapidly unfolding international crisis, coupled with Mr. Seferlis' impaired ability during that period to regulate his response in a constructive and lawful manner. The conduct was impulsive, situational, and isolated.

In evaluating just punishment and deterrence, the Court may also consider that Mr. Seferlis has already suffered significant collateral consequences as a direct result of this case. He has lost the respect and friendship of colleagues, experienced substantial loss of business income from his tour operations, has been subject to nearly nine months of home confinement, has had financial accounts closed by banking institutions, and has endured significant negative media attention in major publications.[15] These consequences are punitive in real and meaningful ways and have already imposed a severe deterrent effect. Despite these reputational and professional setbacks, Mr. Seferlis remains committed to rebuilding both his livelihood and his standing in the community. He is determined to demonstrate, through sustained lawful conduct and service, that this offense was an aberration and to take meaningful steps toward making amends.

Dr. Gramatges' evaluation suggests that the offense conduct occurred in the context of significant executive functioning impairment and neurological abnormalities, and most definitely not in the context of antisocial orientation or criminal intent developed over time. The behavior is described as an anomaly for a person with no prior criminogenic factors and no history of similar conduct. Mr. Seferlis' intact insight, genuine remorse, and sustained compliance with court requirements demonstrate that he understands the seriousness of his actions and the need to conform his behavior to the law. Under these circumstances, a sentence focused on accountability and treatment would promote respect for the law and provide just punishment, while the low risk of re-offense diminishes the marginal deterrent value of a custodial term.

Under these circumstances, a sentence of home confinement, with the mental health treatment recommended by Dr. Gramatges, followed by supervised release would still promote respect for the law and provide just punishment. Such a sentence would unmistakably convey the

---

[15] Upon information and belief, articles have appeared in the Washington Post, the New York Sun, the Jerusalem Post and local news stations in Philadelphia and Washington D.C. have aired segments on Mr. Seferlis' arrest.

seriousness of the offense, while recognizing that incarceration would add little incremental deterrent value beyond what the defendant has already experienced and internalized.

### D. The Need to Protect the Public

A sentence of home confinement with restrictions including mental-health treatment, would adequately protect the public. Mr. Seferlis does not present as an individual driven by animus toward a protected group, nor does he have a history of violence, weapons use, or involvement in extremist activity. There is no evidence of planning or intent to carry out physical harm. He has been on pretrial supervision for nearly nine months without incident and has maintained employment to the extent it has not been disrupted by the offense conduct, further demonstrating his ability to comply with court-ordered conditions and remain a productive member of the community.[16]

The offense conduct is closely tied to emotional dysregulation during a discrete and extraordinary period of geopolitical stress. That risk is manageable and modifiable. With continued supervision and appropriate mental health intervention, the likelihood of recurrence is low.

Dr. Gramatges' risk assessment places Mr. Seferlis at a very low risk of future criminal conduct across all major criminogenic domains. He has no significant antisocial traits, no pattern of criminal behavior, and no current dangerousness. Dr. Gramatges suggests that structured treatment, neurological monitoring, and strong family supervision provide effective safeguards against recurrence. Mr. Seferlis' husband is able to observe behavioral changes and facilitate immediate intervention if necessary. These measures offer meaningful protection to the public without the need for extended incarceration.

---

[16] Since his release, his conditions have been modified to permit travel to his vacation rental property in Maine, extended attendance at religious services, and temporary removal of his GPS monitor to obtain an MRI. He complied fully with all restrictions governing those activities, without incident.

Ongoing supervision and treatment in the community offers a more tailored and effective means of addressing the conduct at issue while minimizing the risk of future harm.

### E. The Need for Education, Vocational Training and Medical Treatment

This case highlights the central role of mental health assessment and treatment in reducing future risk. Based upon his evaluation and MRI review, Dr. Gramatges recommends ongoing medical and psychological treatment as the primary intervention. This includes neurological follow-up, intensive therapeutic programming to address underlying causes of the conduct, and continued psychotherapy utilizing cognitive behavioral and acceptance-based approaches. Such treatment is now feasible given Mr. Seferlis' access to comprehensive medical coverage and stable support system. A sentence that facilitates sustained treatment in the community would directly address the factors identified by the evaluation and reduce the likelihood of future misconduct.

Home confinement followed by supervised release, coupled with the mental health treatment Dr. Gramatges recommends best serves the rehabilitative purposes of sentencing while adequately addressing punishment, deterrence, and public safety.

### V.   The Sentencing Commission's Proposed 2026 Amendments to the Guideline Range Zones Supports a Probationary Sentence with Structured Confinement

The United States Sentencing Commission has formally proposed amendments for the 2026 guideline cycle specifically aimed at expanding judicial flexibility in determining the sentence type. "[T]he Commission identified as one of its policy priorities" the "examination of how the guidelines can provide courts with additional guidance on selecting the appropriate sentencing option (*e.g.* imprisonment, probation or fine)…" U.S. Sent'g Comm'n, Proposed

Amendments to the Sentencing Guidelines (Preliminary) Supplementary Information, at 1 (Jan. 30, 2026).[17]

"The proposed amendment would retain the Guideline Manual's zone-based structure, but Part A of the amendment would provide "further guidance on determining the appropriate sentence type from among those authorized by the guidelines and emphasize the importance of this threshold determination." Part B of the amendment would "expand Zones B and C to increase the availability of sentencing options for certain defendants." U.S. Sent'g Comm'n, Proposed Amendments, supra, at 1, 3.

### A. The Proposed Amendment Would Expand Zone B to Include Mr. Seferlis' Guideline Range

Part B of the proposed amendment expands Zones B and C of the Sentencing Table to increase the availability of non-custodial sentencing options. Relevant here, the proposed amendment would expand Zone B to include sentencing ranges from 4 to 57 months for Criminal History Category I. U.S. Sent'g Comm'n, Proposed Amendments, supra, at 3.

Mr. Seferlis' current advisory guideline range is 30–37 months and he is a Criminal History Category I. (PSR¶205). Under the existing Guidelines, that range falls within Zone D, which authorizes imprisonment only. USSG §5C1.1(f). However, under the Commission's proposed restructuring, a 30–37-month range for a Criminal History Category I offender would fall squarely within the expanded Zone B framework. The proposed amended Sentencing Table, juxtaposed with the current Sentencing Table below, more clearly illustrates the scope of the newly proposed zones:

---

[17] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202602_rf-proposed.pdf

_Current Sentencing Table_                    _Proposed Amended Sentencing Table_




The Commission expressly explained that the purpose of this expansion is to "increase the availability of sentencing options for certain defendants" and to permit courts to impose alternative sanctions where consistent with sentencing purposes. USSG §5, Part A; U.S. Sent'g Comm'n, Proposed Amendments, at 1, 11.

**B. The Proposed Expanded Zone B Would Authorize a Sentence of Probation with Structured Confinement**

The new proposed §5A1.1 _Determination of the Type of Sentence_ with regard to Zone B states:

> Zone B authorizes a sentence of probation, provided that the minimum term of imprisonment specified in the guideline range is satisfied by a period of intermittent confinement, community confinement, or home detention, as provided by the schedule of substitute punishments at §5C1.1(e). In addition, Zone B provides for the sentencing options authorized in Zones C and D. See §§5B1.1(a)(2), 5C1.1(c).

36

U.S. Sent'g Comm'n, Proposed Amendments, §5A1.1.(a)(2).

Accordingly, the amendment to §5B1.1 would state that "[wh]ere the applicable guideline range is in Zone B" … (i.e. the minimum term of imprisonment … is at least 4 months but no more than 57 months for a criminal history category I or at least one but not more than 18 months for the other criminal history categories) … "the court may impose probation only if it imposes a condition or combination of conditions requiring a period of community confinement, home detention, or intermittent confinement sufficient to satisfy the minimum term of imprisonment specified in the guideline range." Proposed U.S. Sent'g Comm'n, Proposed Amendments, §5B1.1, comment. (n. 1(B)).

If a defendant falls in Zone B, the sentencing court has three options: 1) sentence of imprisonment; 2) sentence of probation provided it includes a condition of probation requiring a period of intermittent confinement, community confinement, or home detention, or combination of intermittent confinement, community confinement, and home detention sufficient to satisfy the minimum period of imprisonment specified in the guideline range; or 3) it may impose a sentence of imprisonment that includes a term of supervised release with a condition that requires community confinement or home detention. USSG §5C1.1, comment. (n. 3 (A-C)).

Thus, under the proposed amendment, a defendant with Mr. Seferlis' guideline range could receive probation conditioned on a structured confinement component satisfying the minimum guideline term. The Commission provides examples illustrating precisely this type of sentencing flexibility, demonstrating that probationary sentences with confinement conditions are intended to function as punitive and guideline-compliant alternatives to full custodial sentences. *Id.*

### C. The Proposed Amendment If Adopted Would Reflect a Commission Policy Supporting Individualized Sentencing

The Commission further emphasized that non-imprisonment sentences, including probation with restrictive conditions, "serve a punitive function" and can adequately satisfy sentencing goals in appropriate cases. The amendment, if adopted, would reflect a clear policy judgment that broader sentencing discretion is consistent with Congress's directive to tailor punishment to the circumstances of individual defendants and to impose sentences that are "sufficient, but not greater than necessary."

### D. The Proposed Amendment Provides Persuasive Authority Supporting a Variance to a Non-Custodial Sentence with Home Confinement

Although not yet formally promulgated, the Commission's considered policy determination that defendants with guideline ranges up to 57 months in Criminal History Category I may appropriately receive Zone B sentencing options is highly persuasive. It reflects the Commission's most recent empirical review of sentencing effectiveness and resource allocation and demonstrates that a structured non-custodial sentence for a defendant in Mr. Seferlis' range is consistent with contemporary guideline policy and evolving national sentencing practices.

## VI.    IN THE EVENT THE COURT DETERMINES A CUSTODIAL SENTENCE IS NECESSARY, MR. SEFERLIS REQUESTS A CAMP RECOMMENDATION

The defense respectfully maintains that a non-custodial sentence is "sufficient, but not greater than necessary" to achieve the purposes of sentencing under 18 U.S.C. § 3553(a). However, if the Court determines that a custodial sentence is required, Mr. Seferlis respectfully requests that the Court recommend designation to a minimum-security federal prison camp.

The Bureau of Prisons ("BOP") classifies inmates using a security-point system together with public safety factors to determine institutional placement. Jack Donson, who served with the Bureau of Prisons for twenty-three years and has extensive experience with the BOP's classification and designation system, has reviewed Mr. Seferlis' background and offense

38

characteristics and opined about his designation level and surrounding factors. (Jack Donson Report Exhibit 33, Jack Donson CV Exhibit 34).

Mr. Donson explains that based on the BOP's scoring system Mr. Seferlis would ordinarily fall well within the range associated with minimum security placement, with an estimated security score of approximately four points. However, BOP policy requires the assignment of a "public safety factor" associated with the instant offense that will likely elevate his designation to a low security facility. (Exhibit 33 at 3).

As Mr. Donson explains, that result does not reflect Mr. Seferlis' actual risk profile. Mr. Seferlis has no criminal history, no history of violence, no gang affiliation, and no prior institutional management concerns. Individuals with this profile, particularly those of advanced age and without prior incarceration experience, present extremely low institutional risk. Placement in a higher-security environment would therefore be unnecessary and would expose him to a population of inmates serving substantially longer sentences and with far more extensive criminal histories. (Exhibit 33 at 2, 5).

Mr. Donson further explains that the BOP classification system permits the use of a "management variable," which allows the Bureau to designate an individual to a facility below the calculated security level when doing so better serves correctional management objectives. In his experience, such a designation is significantly more likely when the sentencing court makes a specific recommendation supporting the use of that discretionary authority. (Exhibit 33 at 3).

Mr. Donson also identifies a serious concern regarding continuity of mental-health treatment should Mr. Seferlis be incarcerated. Mr. Seferlis currently participates in consistent weekly counseling in the community and, if he remains at liberty, he anticipates supplementing that care in accordance with Dr. Gramatges' recommendations. Comparable treatment is unlikely

to be available within the BOP, where inmates requiring routine mental-health care typically receive only brief and infrequent clinical contact, often monthly at best, and meaningful individual psychotherapy is rarely available absent an acute crisis. Given the Bureau's well-documented staffing shortages affecting psychology and medical services nationwide, the BOP is unlikely to maintain the continuity of care Mr. Seferlis is presently receiving. (Exhibit 33 at 4, 5).

Accordingly, if the Court determines that a custodial sentence is necessary, a targeted judicial recommendation supporting designation to a minimum-security camp through the use of a lesser security management variable would ensure that Mr. Seferlis is placed in the safest and most appropriate correctional environment. Such a recommendation would materially increase the likelihood that Mr. Seferlis is placed in a facility consistent with his low institutional risk and treatment needs.  Accordingly, and as explained more fully in Mr. Donson's declaration, Mr. Seferlis respectfully requests that the Court recommend specifically as follows:

> *The court recommends the designation to a minimum-security federal prison camp and does not object to the assignment of a <u>lesser security</u> management variable at the BOP's discretion given the defendant's age, lack of prior prison experiences, violence or criminal history.  If the BOP determines a secure facility is necessary, FCI Petersburg, VA is recommended.*

## VII.    CONCLUSION

 After consideration of all the § 3553(a) factors as outlined above, a custodial sentence is greater than necessary to achieve the purposes of sentencing. The undisputed record demonstrates that this offense represents aberrational conduct for a 55-year-old individual with no prior criminal history, very low criminogenic risk, intact insight, and documented neurological findings that warrant ongoing treatment and monitoring. Dr. Gramatges' evaluation suggests that structured medical care and intensive psychotherapy,  not incarceration, most directly address the factors underlying the conduct while safeguarding the community. Moreover, the Sentencing

Commission's proposed amendments expanding the availability of non-custodial sentences within the applicable zones reflect an evolving recognition that defendants who pose minimal risk and present substantial mitigation can be punished effectively without imprisonment.

A sentence of probation with a substantial period of home confinement, coupled with intensive psychological treatment and strict supervision, would impose meaningful punishment, promote respect for the law, deter future misconduct, protect the public, and facilitate the medical and therapeutic interventions necessary to reduce any risk of recurrence. Such a sentence is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.

**Respectfully submitted,**

**LAW OFFICE OF MARGARET M. GRASSO**

*Margaret M. Grasso*

**MARGARET M. GRASSO, ESQUIRE**
**Attorney for Defendant Clift Seferlis**

March 9, 2026

1

Honorable Mark A. Kearney
United States District Court for E.D. PA
601 Market Street
Philadelphia, PA 19016


Dear Judge Kearney,

      I write to you in connection with the regrettable matters in front of you involving Andy (Clift) Seferlis.  My name is John Jay Sullivan, I am 56 years old, I was born and raised in Washington, D.C. and I have known Andy for over 50 years.  Andy and I went through the Beauvoir School for both Nursery and Kindergarten and moved on to attend both middle and high school at the St. Albans School for Boys.  Both Beauvoir and St. Albans are on the grounds of the National Cathedral here in Washington, D.C.  Andy's father, Constantine Seferlis, was one of the master stone carvers at the National Cathedral and, over the years, all of our classmates used to see Andy's father working on stone as we went through our days on campus.  Among many of Andy's professional pursuits, he followed in his father's footsteps and become a stone carver in his own right—completing many different works including head stones for several of our classmates' parents and grand-parents over the years.  The National Cathedral has remained a place that is deep in both Andy's, and my, heart and until these matters before you surfaced Andy had retained an office on the grounds of the National Cathedral for decades.

Over the years Andy and I have attended Evensong together at the National Cathedral several times a month (he attends several times a week), as well as every few months I join Andy at All Soul's Unitarian Church for Taizé.  I value the quiet time in holy spaces but I admit that Andy values it much more than I have as this is much more his regular routine than mine.  I am more of a solo meditator, Andy is more of a prayer in church person.

I say all to this to say that the Andy Seferlis I have known my entire life is a person who finds solace in churches, who regularly spent his free time in places of worship, and loves everything about these places and the people in them.  Knowing this about him makes it almost surreal for me to be writing you about Andy and the matters before you and the Court.  I have attached a photo I found recently of Andy and our Beauvoir Kindergarten class from 1975.



I am the one to the far right with the unfortunate bowl haircut.  Andy is the boy to the left with the curly hair just behind a smiling Meredith Kolodner and her blonde pig tails.  Of the kids in this class I would say that Andy has changed the least of us.  He was always a quiet, even silent, person.  Andy was very observant, very thoughtful, and not at all gregarious.  As a child Andy was a gentle being.  That never changed as far as I ever witnessed.

I never once, in my entire life, saw or heard of Andy get into even a verbal argument much less get into any sort of physical altercation with anyone, ever.  Not once in over 50 years of knowing him.  I have been made aware of the contents of the things that Andy sent and I am stunned by them for many reasons and on many levels.  First off—it just does not fit with the person I have known Andy to be.  I have never heard him express any sort of division— and certainly not along lines of race, gender, or religion.  None of it.  The only thing that does sound like Andy is mail.  Andy sends letters and postcards in the same way teenagers these days text.  I can recall times when I would receive 3 postcards in a week from Andy.  That is his eccentricity.  It is what makes Andy partly Andy.  I can very well understand why receiving mailed letters and postcard would stand out as unusual in today's world of mass telecommunication, but to receive the things Andy sent out in regards to these matters is a whole different circumstance altogether.  There is no excuse WHATSOEVER for the things he communicated to these people and these houses of worship.  That is why I find Andy's actions so confounding, and so unlike him.

While I have the benefit of knowing Andy for 50 years and having the depth of perspective of the whole person, most involved in these matters do not and what they have to go on does not speak well of him.  I write this letter to them as much as I write it to you, to Andy, and for myself.  I never in a million years would have imagined that Andy would have made these statements nor taken these actions.

As I look at the current state of the world, I see, in every direction, people saying and doing things that I never imagined they would.  The world is roiling and in turmoil and folks everywhere are reacting in uncharacteristic ways.  In some ways it reminds me of a line from the famous film, The Breakfast Club, when one person says to the other, "You are not (messed) up, you are a reaction to a messed up situation."  (language cleaned up by me Judge).  The world is

a very messed up place right now and I see people reacting and overreacting to situations everywhere in this country and around the world.  Andy has plead guilty.  He is certainly guilty of colossally bad judgment.  I know that it is cold comfort for those he addressed in his missives to hear from me that while he stated and mailed these things I still believe Andy would never, ever have taken a violent action towards anyone.  I believe that in my heart, it is just not in him.

My legal name is John Jay Sullivan, but the name I was born with was John Sullivan Meyers.  It was necessary to drop my last name when I went into the Screen Actors Guild union in the early 1990s as there was already a "John Meyers".  I am half Jewish.  My late father, Tedson Jay Meyers, was 100% Jewish.  When my father passed away in 2022 Andy, in conjunction with my girlfriend at that time who is from Pakistan and of the Muslim faith, arranged to have flowers placed on the altar and two windows in the Chapel of the Good Shepherd inside the National Cathedral during its annual Lessons and Carols event.  He also arranged for a Remembrance in the Program (see attached).




This is the Andy I have the benefit of long term knowing, and am so imperfectly trying to convey to you and the people whose lives Andy disturbed.  These actions he took are absolutely reprehensible.  They are also completely not in character for Andy.

For two years I served as a DC police officer—from 2018 to 2020.  I served in the area I grew up in as well as the area I was living in at the time.  Andy wrote one of my recommendations for MPD.  I spoke with him often about things I encountered on the street.  On the streets I policed, someone might open up someone else's head with a pipe over an argument about a pack of cigarettes and during so might use the most base language that could be construed as racist or sexist or many other things but what they said was in the flash of heat and anger.  I say this to say that people sometimes say things they do not really mean, during an outburst whereby they lost control over themselves.  In his own way, Andy lost control of himself.  It is the one time I have ever seen it , and I am still surprised by it.  I don't believe he is anti-Semitic in his heart—

far from it--and yet he still communicated the things he sent.  I feel truly sorry for those who were frightened by this and nothing can un-ring that bell, ever.  But I say again—he lost control, used terrible judgement, and wrote what he wrote and sent it…and…he would never have taken any real action towards what he wrote.  I suspect that highly complex and inflamed world matters triggered that gentle person that I have known my whole life to snap-- and these things he wrote and sent were as far an action that Andy had in him to take.

Andy and I have spoken many times since last summer.  He is painfully aware of how deeply he has transgressed against others and, in doing so, broken the law.  He has communicated to me how regretful and sorry he is to have ever allowed larger events in the world to take over his better judgement and, more importantly, hurt and frightened those that he has.  It is just so much more painful that these people are aligned in their own ways to their houses of worship, as Andy is aligned to his own faith.

Judge Kearney-- I am sure that whatever justice you mete out for Andy will be fair and take account of all parties involved.  If it were up to me I would sentence him to go serve the places and people that he disturbed, cut stone for them, learn about them, and maybe, in doing so, they will learn about him.  I rebuke what Andy communicated to these people but I cannot abandon my faith in him as a redeemable human being and I hope that others, in time, will hold space for his redemption.  All of Andy's grandparents, both of Andy's parents, and his only sibling—his brother Leonidas-- passed away a long time ago.  In terms of immediate family Andy has been on his own in the world for a long time.  I have often thought about that in regards to him and how he has navigated life.

Lastly, and perhaps most importantly, I want to convey that I believe there is little risk that Andy would ever do anything like this ever again.  Despite his actions in this matter, he is a very smart person who, in pleading guilty, accepts fault in his actions.  His life is already irrevocably changed by this.  He realizes how much damage he caused to others and that that cannot be taken back.  He has lost some of his friends and colleagues that don't want to be associated, he has lost his ability to freely move around, he has lost the office he had at his beloved National Cathedral, and he has turned inward to do some very deep and necessary soul searching.  He has no previous criminal history whatsoever, and zero violence in his past.  I humbly ask you, Judge Kearney, to be as merciful as you can with Andy while staying within the law.  And to those he hurt, I humbly beg them to find a way, in time, to forgive Andy for his trespasses against them.

Respectfully,

*John Sullivan*

John Jay Sullivan

2

Patricia Byrne



January 2, 2026

Honorable Mark A. Kearney
States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

Your Honor,

I am writing this support letter for Clift Andrus Seferlis. My name is Patricia Byrne. I have
been an attorney for 25 years. I am a senior lawyer in-house at a large multinational
corporation running part of the company's compliance program.

I have known Clift Seferlis since we both attended high school at the National Cathedral
schools in Washington D.C. He dated my best friend for a while when we were in our
twenties, and we have all remained good friends since then. I have spent several vacations
at his cabin in Maine where he always had many visitors, some who stayed for the week,
and others who were just there for a meal, or the day. What always struck me during these
trips was the breadth of political views among these visitors, from far more left wing than I
am, to people who were very conservative. A number of his friends were Jewish, or of
Jewish ancestry. He treated all of his guests with tolerance, and the conversations were
interesting and respectfully conducted. I was therefore surprised to find that Clift had sent
the letters at issue in this case. I do not agree with the views expressed in the letters, nor
his decision to send them. But I have also never heard him express antisemitic or other
kinds of racist sentiments in the past, and I do not believe that the letters are a complete
picture of who he is as a person.

Clift has always been hard working and law abiding. He has been a successful small
business owner in a challenging field that requires him to tactfully deal with a wide range of
personalities. I have seen him diffuse arguments with humor, and deal with interpersonal
conflict sensibly and productively. He is one of the gentlest, kindest, funniest, most
sociable, most compassionate people I know. For example, my much-loved younger

brother died of cancer 8 years ago at 44, and my family was ruptured in a way that is hard to explain to people who have not had a similar experience. What surprised me most at the time were the number of people who remained silent, perhaps because death - particularly of someone as young as my brother - is uncomfortable to contemplate. Clift did not know my brother well. But the year that my brother Michael died, he managed to get Michael's name included in the book for annual blessings for the deceased at the National Cathedral, and he and another friend paid to have one of the Cathedral flower arrangements at Christmas dedicated in Michael's memory. My family is not especially religious. But my mother was moved to tears when I told her Clift and our other friend had done this. The knowledge that Michael was being remembered and prayed for brought us a small measure of solace from our grief. Clift understands what my family and I have been through, and more, because he also lost his brother Leo too young, and both of his parents. But I also believe that his deep compassion would have moved him to take this action, even had he not lost his entire immediate family.

I do not fully understand why Clift has taken the actions that he has in writing these letters. But nothing in my 37 years of knowing this man suggests that he is in any way violent, or likely to engage in conduct that physically hurts another human being. I am worried for my friend, who I think needs help. I hope in determining the outcome of this case you will take into consideration his positive qualities, and that this episode has not been in keeping with the life he has led until now.

Yours sincerely,

Patricia Byrne

3

# Jill S Lillianthal



January 25, 2026

Honorable Mark A. Kearney
Unites States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

Dear Honorable Mark A. Kearney,

I am writing this letter in support of Clift Seferlis in his case before you. I have known Clift for over 21 years, as a co-worker and ultimately a most valuable and trusted friend.

Throughout our working relationship and friendship, I have never felt any animosity or intolerance from Clift towards my Jewish faith. In retrospect, it was quite the opposite. We would chat about how my Jewish background and his Greek background had many similarities.

Clift has been a guest in my home on many occasions and not at any time have I felt threatened or unsafe. In fact, Clift has joined our family for Friday night Shabbat dinners, and life cycle events over the years.

Clift's kindness, unselfishness and respect to all he comes in contact with is undeniable. His friendship is a constant in my life, something I hope I will not have to be without.

Sincerely,

Jill S. Lillianthal

4

December 12, 2025

FROM:

Ian Sanchez



TO:

Honorable Mark A. Kearney
United States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

To Whom It May Concern:

I am writing this letter to express my personal knowledge of and professional respect for
Mr. Clift Seferlis, whom I have known for approximately five years. During this time, we
worked together as tour guides in Washington, D.C., and New York City. Throughout our
working relationship, Mr. Seferlis served not only as a colleague, but also as a mentor to
both myself and others on our team.

Mr. Seferlis has consistently demonstrated an exceptional level of kindness, integrity, and
selflessness. He regularly goes above and beyond to assist others and is someone who will
readily offer help whenever it is needed. He is highly respected by his colleagues and friends
for his generosity of spirit and his genuine concern for the well-being of others.

I have never known Mr. Seferlis to speak unkindly of anyone, nor have I ever heard him
make derogatory remarks regarding any individual's ethnicity, religion, or background. On
the contrary, I have only observed him to be compassionate, inclusive, and deeply respectful
toward all people. He is the type of person who would willingly give the shirt off his back to
someone in need, and he has never displayed any form of animosity or inclination toward
violence.

His desire to help and care for others has been consistent among everyone we mutually
know, including individuals who have known him for more than fifteen years. Without
exception, those who know Mr. Seferlis hold him in the highest regard.

In my experience, Mr. Seferlis is a kind, compassionate, and generous individual, and I offer
this statement with complete confidence.

Sincerely,

Ian Sanchez

5

Seferlis Page 013



**From:** **Debra Sipola** [REDACTED]m
**Subject:** Letter of Character for Clift A. Seferlis
**Date:** January 26, 2026 at 3:44 PM
**To:** maggie@maggiegrassolaw.com

Honorable Mark A. Kearney
United States District Court for E.D. PA
601 Market Street
Philadelphia, PA 19016

It is with great honor and respect I compose this Letter of Character for Clift A. Seferlis.

I have known Clift Seferlis for almost 20 years.  We met when Clift was the tour guide for my 8th grade class trips from Wisconsin to Washington DC. From the moment I met Clift, I sensed how accomplished he was in not only guiding and disseminating information that made history come alive, but the compassion, kindness and interest he showed to everyone, students and adults, on the trips.

Clift works with a very diverse groups of students and adults on tours and in his volunteer work. He is respectful to everyone, no matter the race, religion, age or part of the country they come from. He is always open to educate others and learn from every participant. Clift is a wealth of knowledge on many subjects and is always willing to share and help others understand. He's also a lot of fun to be around. He has a great sense of humor and a warmth that draws people in. Everyone who meets him wants to be in his company.

Clift has always been one to "be of service to others." His volunteer and appointed positions include but are not limited to; Architectural Preservation Boards, Historic Cemetery Boards, President of the City Tavern Preservation Board, DC Tour Guild Guild, elected Positions, a variety of positions at the Washington National Cathedral.The list goes on and on. I would describe Clift as honest, non-confrontational, innovative, charismatic, genuine, law abiding, creative, and always a mentor to others.  I am honored to be his close friend and colleague.

Through this letter I hope the court will better understand, and consider, the many positive qualities of the character of Clift A. Seferlis. I am grateful to be able to show my support of Clift.

If you need any further information, please, do not hesitate to contact me.

Best Regards,
Debra L. Sipola



6

February 20, 2026


Honorable Mark A. Kearney
United States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

Dear Judge Kearney,

My name is Tamara Belden and I write today in support of Clift Seferlis, a long-time friend and colleague of mine. I worked for the Library of Congress for almost thirty years. When I retired in 2005, I became a tour guide here in the city of Washington, DC. I first met Clift as a colleague and then a friend through the Guild of Professional Tour Guides Washington, DC. Clift and I have known each other for almost twenty years. I ultimately became President of the Guild and he, in time, became a member of the Board of Directors. He has volunteered for the Guild giving expert educational events focusing on the architecture of the city. But more than that, I can truthfully say that he has been a widely respected and beloved member of the tour guide community here in DC.

Clift's father was a master sculptor and stone carver who spent much of his career at the National Cathedral here in Washington DC. Clift himself was well known and respected at the Cathedral as a volunteer and docent. He taught many of us about this magnificent building and how to portray it to visitors. He served for several years as the liaison between the Guild and the Cathedral.

Through the years, I have had the opportunity to know and observe Clift in both professional and personal settings. He has consistently been, at least from what I have observed, a kind and compassionate person. He has never, as far as I know, ever deliberately hurt or diminished another person.

I have no desire to condone his actions of last year – there is no defense for such actions. However, what I can say is that from my long experience with him, this was an aberration. For whatever reason, he went down a path that led to this happening. But the man I know, inside, is not that person. So, I can only believe it was a temporary aberration from the person I have known for so long.

All I can say in closing is that I will be there for him every step of the way through this next journey.  I will support him however I can.  He will not be alone – I and many others will help him put his life back together.

Thank you.

Sincerely,

Tamara W. Belden

7

Seferlis Page 018

Rosemarie Russo



January 27, 2026

Andes Clift Seferlis

To the Honorable

I am writing to provide character reference for Andes Clift Seferlis. My name is Rosemarie Russo, and I have had the privilege of knowing Clift for 15 years. I met Clift Seferlis in 2011 when I first started working at Junior Tours. I quickly picked up how admired and respected Clift was with the owners, employees and clients of Junior Tours. I was told that he was the man to consult with for any and all tour questions pertaining to NYC, Philly and DC. Upon my first meeting with Clift, I found him to be very knowledgeable and professional. My first time out as a tour guide, I was told to shadow Clift when I could. When I was on my own, he was always a phone call away, ready to give me advice and places to go and things to do when my tour itinerary had to be adjusted. He answered my calls, whether he was on tour or during his off time, which was hardly ever. Clift seemed to be constantly on-tour, and he was our most requested tour guide. Everyone loved him and would adjust their tour time or book a year in advance just so Clift was guaranteed to be their tour guide. After my first tour with Clift, I could easily see the adoration. He spent quality time with the students and teachers, equally giving them his sole attention and respect, making them feel special and HE was the lucky one to have them on tour. It all came naturally to him. He was always kind and caring to everyone. I can't say who loved him more, the students or the countless teachers that continue to keep in touch with him. His good character always shined through. He made the teachers and students who travelled from small mid-western towns feel safe in a big unknown city. As for the office, not to be too corny, but when he came into the office, the entire staff lit up. We knew he would make us laugh and made us glad to be in his company. He never arrived empty handed, always with bagels, homemade goods or something from a well-known bakery from the city. He always gave his time freely to us, to answer our questions and concerns when it came to getting the itineraries successfully done. Never missed an opportunity to ask us how we were doing and show genuine concern or joy depending on the situation. I, too, came to cherish my growing work relationship with Clift. As time went on, I considered him a very good friend. When my mother passed, Clift was right there for me, he generously offered himself to me by giving my mother's elderly friends rides to and from the funeral to the repast in NJ. This was done after he took the 5-hour drive from DC to my home in NJ during a snow blizzard. He brought food, flowers, but most of all he gave himself. We were really just work friends at this point. But I realized I was very lucky to have him as a true friend from that day forward. One other moving gesture worth mentioning, among many, was when Clift took time from his busy tour schedule to come see me when I was battling cancer. I know it took a lot for him to find the time to travel while on tour to see me. His visit was one of the best forms of medicine I had. Not too many of

my friends were able to come visit me, Clift knew this, so you can imagine how special Clift's visit was for me. I cannot personally speak to what was taken or interpreted from the letters that were written, but I know from what I have witnessed and what I have experienced with Clift that he is NOT a violent man, but a man of honor, self-respect with a sense of pride towards his fellow man and country. His tours were filled with great facts of heroes and sometimes villains, but it is our history, US History. The same history, we as citizens, take pride in and, at times, are ashamed of its acts. But he did what he did and we are here today. We are all very frustrated and affected at what is going on today. I believe Clift Seferis has a big heart and a beautiful soul and would never intentionally hurt anyone. He is good and more spiritually evolved than most people, in my opinion. I believe he is an asset to our community and I am proud to call him my friend.

8

Mathilde Grant



The Honorable Mark A. Kearney
United States District Court for the Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19016

February 25, 2026

Dear Judge Kearney,

My name is Mathilde Grant, and I am writing on behalf of my friend, Clift Seferlis. Clift and I have known each other since 1986, when we met in ninth grade, in high school in Washington DC, and he has been one of my closest friends for nearly forty years.

From the time we were teenagers, Clift has been someone who is deeply curious about the world and eager to share what he learns with others. As we grew up, that curiosity turned into a vocation: he became a tour guide and architectural historian, using his knowledge of buildings, monuments, and city spaces to educate visitors, families, and school groups about history and democratic values. Over the years, he has guided people of all ages—from teenagers on their first trip to Washington to older visitors seeing the capital for the first time—and has tried to help them feel a sense of connection to the stories behind the stones. We grew up in the shadow of the Washington National Cathedral where Clift's father was Master Stone Carver, watching him work on restoring old and carving new gargoyles in the studio in his backyard of his little house in Garrett Park, Maryland in the suburbs of DC.

In his role as a guide, Clift has often been a kind of informal mentor to young people. When he led tours that included teens, he did not just recite dates and names; he asked them questions, listened to what they noticed, and encouraged them to think critically about how our history includes both inspiring achievements and painful chapters. Friends and clients have described him as a "dictionary of history" whose relaxed, approachable manner helped everyone from teenagers to grandparents feel welcome and engaged. I have always been proud that my friend's work has helped visitors—especially young people—see Washington not just as a set of monuments, but as a place where people's choices make a difference in the world.

Beyond giving tours, Clift has shared his stone-carving skills with children for years through hands-on programs. He has demonstrated stone carving at public events such as the National Building Museum's "Big Build," where building-arts professionals introduce kids and families to the crafts behind our built environment. One moment that has stayed with me comes from one of those events. Clift had a stone-carving table, and at one point a group of kids drifted over—some clearly just curious, some a bit restless and bored. Instead of rushing them through, he took the time to show them how

to hold the tools safely, how to listen to the sound of the chisel on the stone, and how small, careful taps could slowly change its shape. Those children ended up staying at his station for a very long time, long after other kids had moved on to different activities. They kept asking questions, comparing what they were carving, and coming back to him for help and encouragement, and he remained calm, attentive, and patient with each of them. Watching a whole group of kids become genuinely absorbed in this demanding, old-fashioned craft because of his gentle teaching was, for me, a powerful reminder of how much he has to offer young people and the wider community.

On a personal level, Clift has been a constant, supportive presence in my life. When I was living in the UK for nearly 12 years when I was in college, he checked in on my parents on a regular basis. He was there to support me and my mother when I lost my only brother to a heart attack in 2019 at age 45, and when my father passed away two years later. Experiences like this are why I have always known him as a kind, loyal, and dependable friend.

I understand that the offenses before the Court are extremely serious, and that the letters in this case caused real fear and harm to Jewish institutions and communities. No one should have to worry that their synagogues, schools, museums, or community centers might be attacked simply because they are Jewish or because they gather to learn and worship. I respect the Court's responsibility to protect those communities and to respond firmly to threats of violence, and nothing in this letter is meant to excuse or minimize that harm.

At the same time, I hope you will consider that this conduct is completely out of character from the person I have known for nearly four decades: a gentle, introspective man who has spent much of his adult life teaching others to appreciate history, architecture, and civic life, and who has given his time and skills to educating and encouraging young people. I believe that the same qualities that made him an effective guide and teacher—his patience, his care for detail, and his desire to share knowledge—also give him the capacity to reflect, to learn from this, and to contribute positively again in the future under appropriate supervision. I respectfully ask that, in fashioning an appropriate sentence, the Court take into account his long history of educating and serving the public, his years of quiet work with children and families, and his potential for rehabilitation.

Thank you for considering my perspective.

Sincerely,

Mathilde Grant

9

Honorable Mark A. Kearney
United States District Court for E.D. Pa.
 601 Market Street
Philadelphia, PA 19016

Dear Judge Kearney,

I, Alice de Mauriac, am submitting this letter as a character reference for Clift Seferlis. I have known Mr. Seferlis for 13 years, initially as a neighbor and friend, and subsequently as a respected colleague while serving together on a non-profit board of directors at River Arts in Damariscotta, Maine.

When I moved into the house next door to his summer cottage in New Harbor, Clift was immediately welcoming. He included my family and me in numerous social gatherings with his friends. From the outset, I recognized his excellent good nature and observed his consistent kindness towards others.

Our relationship evolved when Clift suggested me to the board of directors of a non-profit organization on which he had served for many years. I later became the president of that organization and worked with Clift. I got to know him as a dedicated board member who generously donated his money, volunteered his time to teach stone carving classes for fundraising, and hosted large volunteer gatherings at his own expense each summer. He was consistently dependable, offering thoughtful input when the organization faced challenges and presenting good ideas for moving it forward.

As a property owner, he demonstrated a strong sense of responsibility and consideration for his neighbors. When renting his cottage, he was always concerned that his renters were well-behaved. On a few occasions when renters' dogs caused a disturbance, he ensured the issue was addressed immediately and updated his rental policy to prevent future incidents. His good manners and consideration toward others were always at the forefront.

Through many hours of conversation on a broad range of topics, I know Clift as a person with deep compassion and concern for the world around him. He maintains a consistently positive outlook. Based on my thirteen years of observation and interaction, Clift has always been an upstanding man in all of my encounters. I know him to be honest, fair, and a person of integrity.

Sincerely,
Alice de Mauriac



January 18, 2026

10

**To: Honorable Mark A. Kearney**
**United States District Court for E.D. Pa.**
**601 Market Street**
**Philadelphia, PA 19016**

**Date: January 27, 2026**

**Subject: Character Reference for Mr. Clift "Andy" Seferelis**

Dear Judge Kearney:

Good day. My name is Erik R. Grosof, and I reside at 3█████████████████████████ ████. I can be reached at █████████████ or direct at my desk █████████. I am currently employed by the National Transportation Safety Board (NTSB) as the Chief of the Special Operations Division, where I have served since November 1997.

I have known Clift "Andy" Seferelis since 1995, when we first met while I was serving as the hub manager for US Airways Express at Ronald Reagan Washington National Airport. Over the past 30 years, Andy and I have maintained a close and trustworthy friendship. I have spent time with him at his home, attended family functions, vacationed together, and even traveled abroad with him and his friends to the United Kingdom.

Throughout our long-standing friendship, I have never witnessed Andy act in a violent or aggressive manner. On the contrary, he has consistently demonstrated kindness, compassion, and a willingness to help others. I have seen him assist elderly neighbors, support his brother through substance abuse challenges, and offer help to friends in need without hesitation.

One particularly meaningful example of Andy's character was when he helped me move my mother into an assisted living facility. He not only helped with the physical move but also spent two full days unpacking and arranging her belongings to ensure her new space felt familiar and welcoming. My mother is Jewish, and Andy was not only respectful of her background but also had a warm and friendly rapport with her.

Andy has always been honest and dependable. I have never known him to lie or behave in a way that would cause me to question his integrity or end our friendship. He is a person who avoids conflict and treats others with respect and dignity.

I hope this letter provides helpful insight into Andy's character. Please feel free to contact me if you require any further information.

Respectfully,

**Erik R. Grosof**
Phone: (202) 262-5298
Emails: goose735@gmail.com | erik.grosof@ntsb.gov

11

Honorable Mark A. Kearney
United States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

Robin Daly


January 27, 2026

Dear Judge Kearney,

Clift (Andy) Seferlis has been a neighbor for about 25 years.   We have been friends most of that time.

When we first moved to Garrett Park, we frequently chatted with Andy's father, Constantine, as he walked around the block in his "chugging" step and his wool cap.  Andy was a young man and a loving son.  They invited my family over to view the stone shop and talked about the art of stone carving. We attended Constantine's funeral at the Episcopal Cathedral.  A few years later, we attended the funeral of Andy's brother, Leo.  We didn't know Leo well, but went to his funeral in support of Andy.  I was so moved.  Andy spoke so lovingly of a brother who had, in recent years, struggled with addiction and been hard to love.

I know Andy to be peaceful, law-abiding and generous. He is knowledgeable---even erudite--about world events, history, architecture, art and literature.  He knows so many interesting things about the cities where he leads tours.  He loves the arts.  He loves the Cathedral.  He loves Maine.

Andy is a bit quirky and old-fashioned.  Out of the blue, he will deliver a hand-made card to our porch with the word "hand-delivered" written neatly on the lower corner of the envelope.  One time it was a beautiful photo he had taken of our house at night in the snow; it was matted on a card ready for framing.  Andy loves Star Wars and even mixes Star Wars themes into more "classy" dinner settings.

In closing, I ask you to consider the qualities of a man that I have known for 25 years. He is law-abiding, gentle, generous, smart, witty and kind.

Thank you for your consideration,

Robin Daly

12

February 18, 2026

Ellen Patterson




Honorable Mark A. Kearney
United States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

I am writing this letter on behalf of Clift A. Seferlis.

Clift and his family were my parents' next door neighbors. As a child, Clift spent
time with my parents and in our home. He learned to play the piano from my
mother. As neighbors, my parents, Clift's father (his mother passed when Clift was
young), Leo (Clift's deceased older brother) and Clift were very close.  My parents
and I are of Eastern European Jewish descent.  Through the years, the families
shared celebrations and traditions together.

With the exception of the recent charges…

I have never known, or witnessed, or even heard about Clift being anything but
kind, caring, helpful, generous, and considerate.

After my own mother passed, I found great comfort in knowing that Clift was
watching out for my father, always very attentive and caring.  My father was not
the only person Clift helped though.  I would often not only see, but also hear
stories related to how appreciated he was  by people in and around the
neighborhood.

I cannot imagine Clift having intention of actually harming anyone.  In his actions
he has always been a gentle, kind, and caring soul.  I haven't seen Clift recently,
but I have spent time with and spoken with people who have had ongoing close
contact with him.  No one has ever described Clift in any way different from the
person I've known.

As I began by saying, I'm writing this letter in support of Clift Seferlis.  Please consider in your decisions the person he has proven to be through his lifetime. It remains inconceivable that he would intend to or harm another human being.

Please address the circumstances which he is in now accordingly.

 I believe Clift A. Seferlis to be a good man.

Thank you.

Respectfully,

13

**Brian Ketcham**



**Honorable Mark A. Kearney**
United States District Court for the Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19016

Dear Judge Kearney,

I am writing this letter on behalf of Clift Seferlis, a man I have known well for the past fifteen years.

I first met Clift when he served as the tour guide for a group of roughly 150 of my students traveling to Washington, D.C., and New York City. Over the years, that professional relationship turned into something much more meaningful. We have had Clift as our guide more than ten times, and in that span, he has become someone my family genuinely considers part of our own.

We have spent extended time together, including weeks at his cabin in Maine. During those visits, Clift has always been the same person I first met years ago; eager to show us the best parts of a city, the hidden gems most people miss, or the quiet beauty of the Maine coast. He does these things not to impress, but because he genuinely wants people to experience joy, wonder, and connection. My son views Clift as a kind of "extra uncle," someone who clearly cares about him and takes a real interest in his life.

I could share many stories that reflect Clift's character, but a few stand out.

One year in Washington, D.C., I mistakenly put the wrong date on my best friend's paperwork for a White House tour. As a result, she was denied entry. She was devastated and began crying in line. Without hesitation, Clift stepped out of line himself, gave up his opportunity to tour the Oval Office, and instead took her on an impromptu walking tour near a historic hotel. When we met back up, she was smiling and excited about everything she had seen. Clift sacrificed his own once-in-a-lifetime experience so someone else could feel better.

On another trip in New York City, one of our students was splashed by a passing bus. Clift quite literally gave the student the shirt off his back so the child could dry off and stay warm. It was instinctive—no hesitation, no concern for himself.

Clift is also someone who never forgets birthdays or anniversaries. Cards and letters arrive early, always thoughtful, always personal. These are small acts, but they are consistent, and they speak volumes about who he is when no one is watching.

I have reviewed the evidence referenced in the court filing. While I cannot understand what led Clift to make the mistake he did, I can say with absolute certainty that it does not reflect the man I have known for the past fifteen years. I know Clift made a mistake, and I know that he understands that fully. In my experience, he is not a threat to anyone, now or in the future.

If there is one thing I know about Clift Seferlis, it is that he will spend the rest of his life trying to make things right. That has always been who he is; a person who puts others first, even when it costs him something personally.

Thank you for your time and consideration.

Respectfully,

Brian Ketcham

14

**From:  WILLIAM BILLOW** ███████████
**Subject:**  Letter for Clift Seferlis
**Date:**  February 28, 2026 at 7:03 PM
**To:**  Maggie@maggiegrassolaw.com

The Honorable Mark Kearney
United States District Court for E.D.Pa
601 Market Street
Philadelphia,PA 19016

Good Morning.

My name is William Billow and I am Chaplain Emeritus of St Albans School in Washington DC. I have known Clift Seferlis (whom I know as Andy) since he was my student at St Albans School . He and I have discussed his situation and I believe what happened is an aberration of character for which he has sought appropriate psychiatric care.
I hope the court deals kindly with him as he has sought to make amends.

Thank you,
The  Rev William Billow
Chaplain Emeritus
St Albans. School
Washington . DC. 20016
███████████████

15

Honorable Mark A. Keaney
United States District Court for the Eastern District of Pennsylvania
601 Market Street
Philadelphia PA 19016

Dear Judge Keaney

I am writing on behalf of Clift Seferlis. I first knew Clift when he was young. He was a helpful and polite child. I lost track of him when he went to a private high school and college. I got to know him again when he came back to Garrett Park to care for his father. As his father's health began to deteriorate I was particularly impressed that Clift treated his father cheerfully while maintaining his father's dignity.

Garrett Park is an affluent town of about 2,000 residents in Montgomery County, Maryland, near Washington D.C. I was elected mayor 1n 2004 and served 4 years. Before that I was a high school teacher in public schools for about 40 years. While I was mayor Clift actively participated in various town committees and activities. On one occasion a very large tree fell on the house of one of our residents, more or less cutting it in half; it also brought down live power lines. There was real concern that the house might collapse. Clift voluntarily went into the house to get clothing for the resident and to retrieve her medications. The falling tree temporarily closed the one state highway that flows through the town. Cars were required to turn around. This produced a traffic mess. Clift stayed with me until late evening to calm drivers and persuade them to follow the town's directions.

My husband and I have celebrated Christmas evenings with Clift for several years. I have never heard Clift disparage any group or be interested in politics. He has a strong interest in music and art. For the last several years Clift has been very helpful to an elderly handicapped woman who lives across the street from him. She can be described as having a difficult personality, and Clift still makes an effort to be helpful.

After graduating from college I was a high school teacher in Illinois. I then came to Washington to work at the Bureau of Prisons – essentially as a teacher. One year later I accepted a job as a high school teacher in Montgomery County, Maryland. My experience in the Bureau of Prisons has led me to conclude that neither society as a whole or Clift as an individual would benefit by him being in prison. Clift is a decent soul with many good qualities. Please take into account his good qualities when you consider his sentence.

Sincerely,

Carolyn Shawaker                2/4/26

16

February 24, 2026

Honorable Mark A. Kearney
United States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

Your Honor,

I respectfully submit this character reference for Mr. Clift Seferlis. I have had the privilege of knowing him for nearly 20 years, having been introduced through a mutual friend who had known him as a tour guide for her 5th-grade class. She and her students would visit Washington, D.C. annually and would specifically request him for his expertise and warmth. Over time, as she got to know him better, she realized he and I shared many common interests. She arranged for the three of us to meet for lunch, and it didn't take long for us to become fast friends.

Mr. Seferlis and I share family ties to Maine, a love for architecture, and a mutual appreciation for historic preservation. On that first meeting we exchanged insights from the latest edition of *Preservation Magazine*, published by the National Trust for Historic Preservation. He is the only friend I've had that has ever heard of *Preservation*, let alone to be a fellow subscriber. Over the years, my husband and I have become very close to Mr. Seferlis, and we have been fortunate enough to spend many summers vacationing with him in Maine. In fact, he has made it a tradition to set aside the last week of August for our visit, which coincides with my birthday. He arranges for a local baker to create a special German Chocolate cake, which I cherish every year.

What sets Mr. Seferlis apart is his unique ability to connect people with experiences that are deeply meaningful to them. His thoughtfulness in celebrating my birthday with such a personal gesture speaks to his generosity of spirit. I also recall a time when a friend of mine was grieving. Her sister had lost her eldest child and was seeking a way celebrate her surviving son's birthday. I suggested she reach out to Mr. Seferlis for a personalized tour of Washington, D.C., and the experience he arranged for her family was nothing short of transformative. Without knowing the details of their tragic loss, he tailored the tour to honor their youngest son's love of President Lincoln, including a visit to Ford's Theatre and a stop at Lincoln's summer home, which features an exhibition about the loss of a child. My friend later shared how much that day meant to her family, helping them find a sense of peace and healing.

I have always known Mr. Seferlis to be a person of deep kindness, loyalty, and thoughtfulness. These qualities have been evident in the way he interacts with others, and they have only become more apparent over the years. These qualities were especially evident during the challenging times of the COVID-19 pandemic. As we navigated isolation and social distancing, he became the leader of our small "pod," a close-knit group that relied on one another for support and connection. He embraced the responsibility of maintaining our safety and trust without hesitation, always considerate of everyone's well-being. His commitment helped create a space where we could support one another with care, companionship, and humor.

Mr. Seferlis is a passionate student of history, an avid lover of architecture and art, and a dedicated educator. He has a remarkable ability to share his knowledge with others and is beloved by the countless people whose lives he touches through his tours. I consider myself fortunate to count him as a dear friend and part of his chosen family. He is truly a good person who cares deeply for his friends and their well-being. I sincerely hope this letter provides helpful insight into the character of the individual who stands before you. His actions throughout the years demonstrate that he is a man of integrity, kindness, and generosity.

Thank you for your time and consideration.

**17**

Honorable Mark A.Keaney
United States District Court for the Eastern District of Pennsylvania
601 Market Street
Philadelphia PA 19016

Dear Judge Keaney

I am writing on behalf of Clift Seferlis.

I came to Garrett Park in 1979 when I got married and moved into my wifes house. As time went by I gradually got to know Clift.

Clifts father was a stone carver who worked on the National Cathedral. He taught Clift to carve stone and Clift has spent some summers in Maine teaching short stone carving classes. Clift produced a small stone carving which he gave to the Town in memory of his father. It sits in a garden in front of the Towns only commercial building. As a result of his upbringing Chlift has an abiding interest in the architecture and statutes in the District of Columbia. He now makes his living as a tour guide in D.C, describing these things to his clients. Because of his fathers work, Clift was enrolled in the private high school operated in conjunction with the National Cathedral, I do not know about Clifts religious beliefs, but I know he loves that cathedral, its music and liturgy,and is not any kind of fanatic.

To me, Clift has always been kind and decent. I think of him as one of the worlds innocents, concerned with music and architecture, and not caught up in the politics of hate which seem to characterize society today. I am told has been charged with writing antisemetic hate letters. I have not seen these letters, but hatred is very contrary to the Clift I know. I can only speculate that the unending pain of the people in Gaza caused him to write.

I urge you to consider Clifts many good qualities when you sentence him.

Sincerely,

Edward Spear    2/5/26

(I am a retired Department
Of Justice lawyer.)

18

Gilbert Carmichael



February 27th, 2026

Honorable Mark A. Kearney
United States District Court for E.D. Pa
601 Market Street
Philadelphia, PA 19016

Dear Honorable Mark A. Kearney,

I am a friend of Clift Seferlis and have known him since my early days at high school in Washington D.C. I was from out of state and a boarder at the school; Clift was one of the first day-students to introduce himself to me. We lost touch after high school but reconnected after I moved back to DC in 1997. Since then, we have shared many experiences together - from times of great sadness like when he lost his father and later his brother but also times of happiness when traveling, touring, or hosting events in our homes.

I have always known Clift as a generous and caring person. He has repeatedly made time out of his busy schedule to provide detailed and personalized tours of DC for my friends and family and refused compensation. We always look forward to his annual Christmas party and joining him vacationing in Maine during the summer.

I hope that the court considers the ingrained positive qualities that he has consistently shown to me during our 42 years of friendship.

Thank you,

Gilbert Carmichael

Gilbert Carmichael

19

James Lee



February 1, 2026

Honorable Mark A. Kearney
United States District Court for E.D.PA
601 Market St
Philadelphia, PA19016

Dear Judge Kearney,

I was introduced to Clift Serferlis over twenty years ago.  He was the lead tour guide for our group of students from the middle school where I teach on our three day tour of Washington, D.C..  As the lead teacher I have worked closely for many years with Clift to build a trip that would be meaningful to the ethnically and religiously diverse student body of our school.  Clift was keen to incorporate activities that would bring a more fulfilling experience to the students.  His sensibility to our situation shone through.  Our trip has grown in size each year since due to the awareness Clift brings.

My partner and I have been to Washington, D.C. separate from touring with the school in order to spend time with Clift.  He, to us, was, and is, an open-minded individual who sees the best in a multicultural world.  He is passionate about equality, and that made us, as a same-sex couple, comfortable in his presence to want to be friends.  Clift has offered his cabin in Maine to us to stay as we have offered to host him in any travel to Michigan he may have.  We do not associate with those who harbor ill-will based on arbitrary characteristics, and therefore felt Clift to be a good choice in confidante and friend.

I wholly support Clift Serferlis and the inclusive, honest, and benevolent attitude he brings towards life.  He is an asset to those young minds coming to tour Washington, D.C. as his comprehensive knowledge, coupled with his inclusivity and desire to incorporate activities to which a diverse body can relate, without hesitation or pause, is one the world needs.  I hope the court sees that his decades of positive influence has merit and should continue.

Sincerely,
James Lee
Teacher
Hillside Middle School
775 N. Center St.
Northville, Mi 48167

20

Hon. Mark A. Kearney
United States District Court for E.D. PA
601 Market Street
Philadelphia, PA  19016


Dear Judge Kearney,

I am writing on behalf of my good friend, Clift ("Andy")
Seferlis, who I have known for more than twenty years,
initially as a tour guide, but as a close friend in more
recent years.

Clift is a kind and introspective man — a skilled stone
carver whose work reflects patience, care, and  a deep
reverence for craft. He has been thoughtful, gentle, and
respectful in his relationships with others. He has
maintained long-standing friendships, including with
members of the Jewish community, and has never before
expressed views or actions suggesting hatred or
aggression of any kind, whatsoever.

The letters he recently sent, which understandably may
have caused fear and distress, are completely out of
character. When I learned of them, I was shocked and
deeply concerned.  I want to be clear that I do not
minimize the seriousness of his actions, but I do not
believe they stem from malice.  Instead, I suspect that

they may reject a sudden and uncharacteristic mental health episode. You should know that his brother committed suicide.

Clift is active in the community, generously volunteering his time to teach others the art of stone carving.  His contributions also include much time donated to various projects at Washington National Cathedral, including tours to train tour guides, and providing free public tours. Clift has had a non-stop affiliation with the cathedral since his time as a student at St. Albans School. This is a man who has quietly dedicated his talents to preserving cultural heritage and helping others learn.

Thank you for your consideration.

Very respectfully,

Jim Carr
Colonel, U.S. Army (Ret.)
President
National Federation of Tourist Guide Associations
█████████████
███████████████
█████████
███████████████
████████████

21

January 21, 2026

Honorable Mark A. Kearney
United States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

Dear Judge Kearney,

I am writing this letter in support of Clift Seferlis and to respectfully offer insight into his character based upon our personal relationship.

I first came to know Clift in his capacity as a Washington, DC tour guide through the school I lead. Clift has worked with our school for over 10 years as a guide, routinely spending 5-6 days with us in our nation's capital. Over time, our relationship developed from a professional one into a genuine friendship marked by friendly correspondence, shared interests, and a mutual love of country and its history.

Clift is a person of strong character and quiet integrity. He is considerate in his words and actions, listens carefully to others, and engages respectfully even when perspectives differ. What stands out most is his ability to interact graciously with people from all walks of life. Regardless of background or circumstance, in my experience, Clift treats others with dignity and sincerity.

Based on my experience, Clift is someone who seeks to do what is right, reflects deeply, and desires to be a positive presence in the lives of those around him. While no man is perfect, I believe Clift should be understood by the totality of his character.

I respectfully ask the court to consider Clift Serferlis' integrity, his commitment to contribute to society in all sorts of constructive ways, and the positive influence he has on those who know him.

Thank you for your time and careful consideration.

Sincerely,

J. Taylor Hasty

22

Honorable Mark A. Kearney

United States District Court for E.D. Pa.

601 Market Street

Philadelphia, PA 19016

I have known Clift A. Seferlis for over 12 years. What started as a business tie between a group tour guide and a chaperone has developed into a friendship that I cherish over many. It was as a tour guide that I developed an appreciation for Clift and the man that he is. Clift is a hardworking, attentive, caring, compassionate and empathetic man.

Every trip with Clift begins with a conversation before the trip even starts. His main goal is to make sure that every member of our group is having a good time. He goes out of his way to talk to kids who have isolated themselves or appear to be down and asks them questions about what they are interested in and how he can work in their interests in an already packed trip. Years later he will still ask about those kids and how they are doing. Every trip with Clift ends with what he can do better for next year's group.

Last year, we had a young lady on our trip who, although was reminded to bring her passport with her to the White House, she forgot it on the bus. By the time her mistake was discovered, the bus had moved over a mile away from our location. The young lady was devastated and tears flowed. Clift easily could have said that the buses were gone and left her without a valuable experience, but he did not. Clift jogged to the bus and back to the White House in time for us to make our appointment. His efforts allowed a young lady to have a more valuable experience in our nations Capitol and a more valuable impression of a man she did not know. She still talks about what that meant to her today.

Clift has given his time and his places of residence to me and my family as well. During Covid, Clift invited my son and I up to his residence in Maine. He then took us from Maine to Maryland and gave us personal tours of several Ivy League colleges. He even arranged for lodging for my son and I in Boston at his own personal expense.

When my wife and I first moved into our new home, Clift had come to town to see another friend. While explaining my trepidation about climbing our 2nd story roof to hang our Christmas lights, Clift asked for the lights and a ladder. Without thought, he scampered up on the second-floor roof and had the lights hung without a second thought.

Clift has a memory like a steel trap. He remembers details I struggle with. Birthdays, anniversaries and more importantly, little things that he can tell bother people. He never fails to ask me about my parents when we talk, and the struggles of their aging. His conversations help me compartmentalize and deal with these difficulties.

My hope is that you will take into consideration the lifelong man that Clift is. My life is better for him being in it. My stories of Clift are a tiny, microscopic portion of positivity I have seen him add to the lives of many. I hope his positive traits will be taken into consideration.

With much respect for your position,

Mike Stitt



23

February 28, 2026

Honorable Mark A. Kearney
US District Court of E.D. Pa.
601 Market Street
Philadelphia, Pennsylvania 19108

RE: Sentencing of Clift A. (Andy) Seferlis

Dear Judge Kearney:

I have known Clift A. (Andy) Seferlis for more than thirty years. We both own property in Maine on the Pemaquid Peninsula. As neighbors, my family and I have deepened our friendships with him during our summers there. When I learned of Andy's arrest and the crimes he has acknowledged committing, I was shocked and deeply concerned. I abhor antisemitism and feel frightened by its re-emergence, especially in recent times. I cannot explain what happened here, but I know Andy and believe that his actions are completely inconsistent with his past behavior. I would consider him to be among the least antisemitic and violent people I know. I have known Andy to be kind, tolerant, intelligent and open minded. He has friends of all racial, religious and economic backgrounds. When my husband was seriously ill and later, when he died, Andy's kindness, empathic listening and supportive words were comforting. He made it a point to stay in touch with me by calling and writing. He planted a tree I had been given in memory of my husband after talking carefully about where it could be located in my yard in Maine. He made sure to let me "help" so I could feel I was a part of the process. Andy has cooked delicious food for my family, invited us to dinner, and is also a supportive friend and neighbor to many others. I trust him completely. I have had a long career in mental health as a Licensed Clinical Social Work (LCSW) and believe I am a good judge of a person's character.

Judge Kearney,I do not envy the task you have in deciding the sentence here. I know there must be consequences for what Andy did. I can imagine the anger, fear and distress of the recipients of the letters he sent. I know also, from talking with him, that Andy is deeply remorseful. I have never heard him try to excuse or minimize the impact of his crimes. I ask you to consider that he is voluntarily participating in counseling to try to understand what has happened here. I also ask you to consider that he has no previous criminal record, that he has a long history of employment as  tour guide/teacher/historian/sculptor and artist. His creative work with children and adults has benefitted many communities. I know that he prioritizes living and working collaboratively over earning money. I think of him as a person who really  does make the world a better place.

I am not an attorney and do not know what is possible, but I have read about restorative justice approaches to sentencing which focus, not only on consequences for the offender,but also on victim needs, the possibility of victim-offender dialog and alternative ways of making restitution.  I have read that, when crime victims are willing to participate, this can be helpful to them,too. Could such an approach be considered for Andy's sentencing? I would so like to see something restorative and redeeming come out of this difficult,painful situation.

Thank you for considering my letter. Please let me know if there is further information I can provide.

Sincerely,

Jane A Tipton

24

Honorable Mark A. Kearney
United States District Court for E.D.Pa.
601 Market Street
Philadelphia, PA. 19016

Dear Judge Kearney

My son Gilbert and Clift Sefer[is started
at the St. Albans School in 84". I know him
but by no means well. After graduation from
college, Clift or better known to me as Andy
visited a friend in Birmingham. My name was
prominently above my Interior Design Business
and Andy popped in. This began our renewed
friendship which grew. Andy is a people
collector as am I so our friendship flourished.
Andy would visit here often. I always have a
large gathering at thanksgiving with an open
door policy; so Andy became one of the group.
Each year he would arrive and stay in the house.
He is a gifted cook among his other talents
and he would join me in the kitchen and be
extremely helpful. Several times he would ask
if he might bring a guest. They were always

interesting gals who would add a lot to the party.

I also would see Andy in DC as my son resides there. It might be at the "City Tavern Club" in Georgetown where he belonged or at restaurants or dinner at home. Once he took us on a tour of DC which was very informative. Andy is a great conversationalist as he is well-informed, very bright and articulate — he has a curious mind. He shoulders responsibility well as he has been the caretaker of the "Oak Lawn Cemetary" in Georgetown restoring headstones, etc. He is a gifted stone carver; a skilled he learned from his father. He teaches classes in the skill and has worked for the National Cathedral, the Smithsonian, Hillwood to name a few.

Andy endeavors to spend August at his family's log cabin in Maine. I have been an invited guest there where its "you all come" and varied people of all ages and nationalities come and go especially to enjoy the dinners which are lively and full of conversation and the beautiful sunsets. People like Andy!

Andy is very personable and is always willing to share his skills which might include stone carving, photography or his vast knowledge on architecture. He once took a whole day of his time taking me — small

Maine towns explaining the history of each one.

I hope the Court might give consideration to the Andy I know. Frankly when I heard of the charges I was thinking I was not hearing correctly. My personal hope is that he can get professional help to guide back on the right path. My summation is that Andy is a kind, caring, generous person with good values but must have "flipped his lid!"

Sincerely,
Andrea Carmichael

25

Dear Judge Kearney,

My name is Adam Pachter, and I live with my wife and two daughters at 67 Quincy Street in Arlington, MA. I am a devout Christian, as well as an occasional lay preacher, and I served in Arlington's Town Meeting for 18 years. A former lawyer who clerked for Judge Selya on the 1st Circuit before practicing for a few years at Covington & Burling, I am currently a professional writer and also teach screenwriting at Wheaton College. I have known Clift A. Seferlis (whom I typically refer to as "Sef") for more than 45 years, ever since we met in 2nd or 3rd grade at Beauvoir Elementary School in Washington, D.C.

Clift, whom my daughters call "Uncle Snuffie," is one of my oldest, closest, and most loyal friends. He was a groomsman at my wedding, and my younger daughter Maya is his goddaughter—believe me, she could not have a better one. I went to St. Albans School from 4th-12th grade with Clift, have travelled to Spain and Greece with him, and have spent countless hours chatting, playing tennis for milkshake stakes, and enjoying excellent food and drinks on the porch of his house in Maine, a house he always reserves for our family's weekend visit in August. Such is my affection for Clift that in December 2024 I flew down from Boston to make a surprise appearance at the legendary Christmas Party he throws at his home in Garrett Park, Maryland.

I trust Clift completely, absolutely, and without hesitation. To the best of my knowledge and belief, I have never in the more than 45 years we've been friends heard him say anything threatening and/or anti-Semitic to or about anyone. He has numerous Jewish friends and was absolutely devoted to my late father Marc Pachter, a Smithsonian museum director who was raised Jewish. I spoke at Clift's father Constantine's memorial service, and Clift has been a source of courage and comfort as I have dealt with the grief from my own father's passing in 2024.

I was shocked when I heard the accusations against Clift, and the situation is still difficult for me and my family to process, but I am glad he has accepted responsibility for his conduct. However, I firmly believe that his actions represent an aberration, and not an indication, of his fundamental character, and that is why I am very glad to have the chance to serve as a character witness for him.

I look forward to providing more details at the March 16th hearing, but
if you have any questions before then, please do not hesitate to reach out to me at
███████████████████████████████████████████████

Sincerely Yours,

Adam Pachter

26

3/1/2026

**Honorable Mark A. Kearney**
United States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

Dear Judge Kearney,

I am writing to you in attempt to portray the real character and nature of Clift "Andy" Seferlis.

I've known Andy for 30 years since I've befriended him and several of his classmates from St. Albans Preparatory school in Washington, DC. His father was a Master stone carver and helped shape 20th century DC with his carvings (specifically the Gargoyles adorning the National Cathedral), etchings, repairs and sculpting of the great stonework adorning the city. Andy followed in his footsteps, and when there wasn't a lot of stonework to be done, became a licensed tour guide in Washington, as well as Philadelphia and New York City. With this exciting and eclectic background, Andy has not only gathered the most interesting stories of anyone I know, but also a group of the most diversified friends I've ever met. At Andy's famous annual Christmas party, you will find people from all races, creeds and religions crowded around him, listening to the funny things that happened at an underground tunnel in DC or at the top of a skyscraper in NYC. That same group of broad-ranging friends would do anything for Andy, I've seen it. And he'd do anything for them.

Andy is one of the kindest, most generous souls I've ever met. He is also apolitical, unbiased, even tempered, and lacks the ability to see color. He has a brilliant and thoughtful mind, and is kind towards children and his elders, and everyone in between. Truly one of the good ones.

I'm not sure where this temporary lack of judgement came from, and he is too embarrassed to explain. We've all asked for a second chance, and I truly share the belief with everyone who knows him that Andy deserves one now. He should not be judged by this incident, but instead as the man of peace and non-violence that I've seen played out over and over for my entire adult life. Society is better off with Andy in it.

Judge Kearney, as insignificant as I am to this story, I plead for leniency towards Andy. He deserves it. I welcome the opportunity to explain further if appropriate.

Thank you,

Sincerely,

Michael Lawrence

27

Honorable Mark A. Kearney
United States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

March 5, 2026

Re: Character Reference for Clift Andrus Seferlis

Dear Judge Kearney,

Andy Seferlis is not a threat.

I am Rolando Garcia, his spouse, and I reside at ███████████████████████. I can be
reached at ███████████████████████.

I have been quietly and privately involved with Andy for 25 years and can confidently say that I know
him better than anyone.

Throughout our years together, there have never been any instances of abuse, harm, or violence
towards anyone. I can recall only two occasions when he was genuinely angry. While we have
experienced disagreements, these are typical in most relationships. On many occasions, Andy has
gone out of his way to help his friends; he never hesitated to drive to New York City to pick up a
stranded friend or to serve as a medical advocate for an aging friend.

Based on the letters you have received, I believe you understand that Andy's kindness, generosity,
consideration, and respect for others are central to his character. These qualities are why we have
remained together for many years.

I have also observed that Andy is not the person he once was. He frequently expresses remorse for
those he targeted and is struggling to find ways to make amends with the recipients of his
correspondence. Although therapy has been beneficial, he would likely benefit from a more intensive
program.

Over the past 9 months, I have closely monitored Andy. He has given me no reason to be concerned
about any threatening communications, whether by mail or online. Since he uses my laptop, I am
able to review his digital activity. My vigilance will continue regardless of the outcome on March
16th. With respect to the severity of charges, I believe that incarceration would serve no benefit to
the public.

Sincerely,

Rolando Garcia

Rolando Garcia

28

From: **Bette Runck** ████████████
Subject: Letter supporting Clift Seferlis
Date: March 6, 2026 at 4:54 PM
To: maggie@maggiegrassolaw.com
Cc: Andy Seferlis ████████████

Dear Ms. Grasso,

Below, please find a letter in support of Clift Seferlis.

Thank you,
Bette Runck

March 6, 2026

Honorable Mark A. Kearney

United States District Court for E.D. Pa.

601 Market Street Philadelphia, PA 19016

Sir:

I have lived across the street from Clift Seferlis for 45 years, long enough and close enough to consider him family. Andy, as I've always called him, grew up in Garrett Park, the son of a well-known sculptor and his wife. Ours is a town of a thousand people, who, like the Seferlis family, are committed to civic responsibility and social cohesion.

Several times since Andy's arrest, neighbors have told me that they are shocked by the news reports of his actions. A few times, at holiday parties, Jewish neighbors have singled me out to express their disbelief that the man they've known could have expressed antisemitic views. I am as puzzled as they are.

Over the years, I've witnessed hundreds of examples of Andy's kindness and his unfailing good humor. He routinely goes out of his way to include acquaintances in social gatherings, notably his annual Christmas Eve parties. One instance: For several years, he invited a woman who annoyed many of us. When I finally asked him why he included her, he explained that she'd lost her entire family. Most troubling, her mother had been murdered. Rather than basking in his magnanimity, he told me about her without embellishment, as if his reasons should be obvious. On other occasions, I've accidentally learned that Andy has assisted the infirm or dying—all without fanfare.

In all the years I've known Andy, I've never once heard him express antisemitic sentiments–verbally or by implication. Nor has he ever exhibited racist beliefs or behavior. Andy has always shown open-hearted

acceptance of everyone he encounters.  If I were to describe him to a stranger, I would say that he is warmly friendly and occasionally mischievous.

Andy is widely viewed as a stellar interpreter of Washington, DC's architectural, cultural, and historical heritage.  By sending the letters that are seen to be threatening, he has seriously damaged the reputation he has built over the past three decades.  I sincerely hope that any punishment meted out to him will not further undermine his future contributions.

Respectfully,

Bette Runck

29

Honorable Mark A. Kearney
United States District Court for E.D. Pa.
601 Market Street
Philadelphia, PA 19016

George A. Albany IV



Your honor, I have had the pleasure of knowing Clift Seferlis for almost 10 years. He was introduced to me as a fellow tour guide and in the time since, we have become friends and I have learned he is one of the premier guides of Washington DC, boasting a unique connection to the city.

Clift is generous with his knowledge and experience. Sites like The National Cathedral and Oak Hill Cemetery would have suffered had he not shared his expertise at many events and workshops. In my opinion, the guiding community as a whole, across several cities and states have benefitted from his mentorship.

As a man who has known great loss in life, he has made family out of his friends. I have often spoken with him during hard times about Parkinson's disease, which took his father and is impairing my own.

Kindness, humility, and a sense of justice are further trademarks of his, along with a signature bow when he thanks people. His home is open to travellers and those in need alike. I attended a dinner at his house and remember when one guest began making thinly veiled comments, disguised as questions about another guest's ability to afford the neighborhood. Clift quickly invited the offender into the kitchen to help with drinks, and when they came back that topic was not returned to.

I was shocked to learn about the charges Clift is facing, as they are not in line with the person I have come to know. I hope that when it comes to sentencing, your honor and the court will consider him as a valued and contributing member to many communities among historic and architectural interests as well as hospitality driven sectors.

30



## PSYCHOLOGICAL EVALUATION

**Name:** Clift Seferlis
**Date of Birth:** ▮▮▮▮▮▮▮
**Dates of Assessment:** 11/18/25
**Date of Report:** 02/09/26

### Identifying Information

Mr. Seferlis was a 55-year-old Caucasian male who was referred for a psychological evaluation. The charges were:

- 18 U.S.C. § 876(c) (mailing threatening communications – 17 counts)
- 18 U.S.C. § 247(a)(2) (obstruction of free exercise of religious beliefs – 8 counts)

### Purpose of Evaluation

The purpose of this evaluation is to render opinion regarding mental health diagnosis and treatment recommendations. All opinions expressed in this report are within a reasonable degree of psychological certainty.

### Informed Consent

Mr. Seferlis was informed about the purpose, nature, and anticipated use of the evaluation; who will have access to the information; associated limitations on privacy, confidentiality, and privilege; and the voluntary or involuntary nature of participation including potential consequences of participation or nonparticipation. Mr. Seferlis was advised that the information obtained during the evaluation would not be confidential and would be used to prepare a report for the court. Mr. Seferlis indicated understanding and agreement to this evaluation.

### Sources of Information

- Magistrate No. 25-1268 Affidavit
- Criminal No. 25-453 - General Allegations
- Criminal No. 25-453 - Exhibits
- Structured interview with Mr. Seferlis
- 10/28/25 Laboratory Results
- 12/31/25 Magnetic Resonance Imaging at Walter Reed National Military Medical Center
- 07/11/25 to 01/16/26 Psychotherapy Notes

### Interview with Mr. Seferlis

▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮



## Collateral Information

Case: 2:25-cr-00453-MAK     Document 50     Filed 08/09/26     Page 119 of 161







MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

Case 2:25-cr-00453-MAK    Document 50    Filed 08/09/26    Page 122 of 161

MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

Case 2:25-cr-00453-MAK    Document 50    Filed 08/09/26    Page 123 of 161



MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

Case 2:25-cr-00453-MAK    Document 50    Filed 08/09/26    Page 124 of 161



Case 2:25-cr-00453-MAK    Document 50    Filed 08/09/26    Page 125 of 161



s and was a personal weakness overall along with deductive reasoning, fluid intelligence, and



MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

- ██████████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████████████████████████████████████████
  ███████████████████████████████████████████
  ███████████████████████████████████████████████
  ████
█ █████████████████████████████████████████████
█ ██████████████████████████████████████████████████
█

████████████████████████████████████████████████
█████████████████████████████████

_____          _Gabrielle Jeffers, PsyD_

Marc A Gramatges, PsyD, ABPP, CBIS          Gabrielle Jeffers, PsyD
Neurorehabilitation Psychologist            Post Doctorate Fellow
License #PS017448

Case 2:25-cr-00453-MAK   Document 50   Filed 08/09/26   Page 129 of 161

## Data Summary





Case: 2:25-cr-00453-MAK     Document 50     Filed 08/09/26     Page 131 of 161

| | | Scaled | Standard | | | | |
|---|---|---|---|---|---|---|---|







Case 2:25-cr-00453-MAK    Document 50    Filed 08/09/26    Page 134 of 161



31

**MARC A. GRAMATGES, PSYD, ABPP, CBIS**
100 W 6th Street, Suite 305
Media, PA 19063
484-445-4147 - Fax: 484-445-4149
MarcGramatges@MG-TS.com
www.MG-TS.com
Pennsylvania License #PS017448
New Jersey License #35SI00541700
American Board of Professional Psychology #8623

### Current Employment

**Owner/Neurorehabilitation Psychologist**
July 2014 – Present
MG Therapeutic Services LLC
Media, PA 19063

Founded MG Therapeutic Services LLC and serves as owner/director with the goal to provide empirically based care while employing mindfulness-based practices and approaches. The practice offers assessments and psychotherapy to the general community. With a diverse group of employees, the practice covers several specializations specifically neuropsychology, educational evaluations, forensic evaluations, employee assistance, military veterans, and clinical psychotherapy for both children and adults. Personal areas of specialization include: neuropsychology, educational evaluations, forensic evaluations, military veterans, clinical psychotherapy, and substance use.

**Adjunct Professor**
August 2014 – Present
Immaculata University, Immaculata, PA 19345

Teaches psychology at an undergraduate setting as an adjunct professor. Current class focus is on Abnormal Psychology examining modern concepts of diagnosis, classification, treatment, and prevention of psychological disorders. Emphasis is on the necessity for developing an understanding of the diversity of approaches to psychopathology including: behavioral, biomedical, cognitive, interpersonal, psychoanalytic, and humanistic.

**Forensic Psychological Evaluator**
March 2015 – Present
Diagnostic Services
Delaware County, PA

Contracted to perform forensic psychological evaluations and consultation independently for adults, juveniles, and as a member of the Delaware County Mental Health Evaluation Committee. Also contracted with the Delaware County Office of Intellectual and Developmental Disabilities for review of adolescent psychological evaluations. Evaluation types include diagnosis and treatment, competency, intelligence, criminal responsibility, juvenile

MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

Seferlis Page 096

Case 2:25-cr-00453-MAK   Document 50    Filed 03/09/26    Page 137 of 161

decertification, personality, and neuropsychological evaluations. These evaluations include those in an outpatient and a prison setting. Has also provided expert witness testimony and evaluations for both the defense and prosecution at the state and federal level.

**73B Army Clinical Psychologist**
March 2022 – Present
Pennsylvania Army National Guard

Applies psychological principles, theories, methods, and techniques through direct patient services, consultation, education, and research in problems of human effectiveness, adjustment, and emotional disturbance in medical and other settings. Concerned with investigations, evaluations, and amelioration of mental and behavior disorders; prevention of mental illness; promotion of effective mental health. Duties include evaluations for the Soldier Readiness Program (SRP), Sniper clearances, separations, and Profile reviews for the Pennsylvania Army National Guard.

## Education

**Psychological Doctorate, Clinical Psychology**
August 2012
Immaculata University, Immaculata, PA 19345
APA Accredited, Clinical Psychology Program
Dissertation: *Dream Content and Post Traumatic Symptoms in Military Veterans*

**Master of Science, Psychology**
March 2006
Capella University, Minneapolis, MN 55402

**Bachelor of Science, Psychology**
August 2004
University of Maryland University College, Adelphi, MD 20783

**Associate in Applied Science, Mental Health Services**
September 2004
Community College of the Air Force, Gunter Annex, AL 36114

## Certifications

**Board Certified Rehabilitation Psychologist**
Certification #8623
February 2018 – present
American Board of Professional Psychology

**Certified Brain Injury Specialist**
Certification #12070
December 2012 – present

Seferlis Page 097

Academy of Certified Brain Injury Specialists

**Certified Advanced Alcohol and Drug Counselor**
Certification #200108
March 2008 – March 2020
Bureau of Drug and Alcohol Programs, Pennsylvania

**Victim Advocate**
October 2005
Ali Al Salem Air Base, Kuwait

**Critical Incident Stress Management:** Individual Crisis Interventions and Peer Support
December 2003
Keesler Air Force Base, MS 39534

**Certified Emergency Medical Technician**
November 2001 – December 2004
Camden County Community College, Blackwood, NJ 0801

## Clinical Academic Experience

**Post-Doctoral Neuropsychology Fellow**
July 2011 – June 2014
Bancroft NeuroHealth Brain Injury Services
Plainsboro, NJ 08536
Provided day treatment rehabilitation for individuals with acquired brain injury utilizing a team approach. Also provided residential/outpatient support and treatment for adults with developmental disorders. Emphasized consulting with occupational therapy, physical therapy, nursing, speech therapy, residential management and direct care staff to determine treatment interventions. Provided individual treatment, group treatment, and neuropsychological assessment. Provided supervision and development of treatment program for day treatment and in-home services.

**Neuropsychology Internship**
July 2011 – June 2012
Bancroft NeuroHealth Brain Injury Services
Plainsboro, NJ 08536
Provided day treatment rehabilitation for individuals with acquired brain injury utilizing a team approach. Emphasized consulting with occupational therapy, physical therapy, nursing, speech therapy, residential management and direct care staff to determine treatment interventions. Provided individual treatment, group treatment, and neuropsychological assessment. Co-designed and implemented a substance abuse treatment program for day treatment services. This was conducted part-time in conjunction with Rutgers Camden.

MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

## Clinical Psychology Internship
July 2011 – June 2012
Rutgers-Camden Student Health Center
Camden, NJ 08102
Conducted outpatient individual, couples, and family therapy in an university counseling setting. Patients were diverse, coming from various backgrounds, and present with a range of diagnoses. Also participated in crisis intervention, outreach to the campus community, and consultation with other administrative and academic departments. This was conducted part-time in conjunction with Bancroft Neurohealth.

## Psychotherapy Practicum
January 2010 - September 2010
Holcomb Behavioral Health Systems
Upper Darby, PA 19082
Counseled clients, individually and in group sessions, to treat mental health referrals in an outpatient setting. Maintained records and reports regarding the patients' histories and progress, services provided, and other required information. Developed client treatment plans based on research, clinical experience, and client histories. Provided clients and family members with information about mental health disorders and about available services and programs, making appropriate referrals when necessary. Population primarily consisted of lower income families.

## Diagnostic Practicum
January 2009 – July 2010
St. Christopher's Children's Hospital
Philadelphia, PA 19134
Conducted psychological evaluations for primarily children and adolescents in a hospital setting. Administered tests and interpreted the results to check mental abilities, aptitudes, learning disabilities, and personality characteristics of clients. The testing was primarily conducted as a component of research studies to evaluate behavioral trends of children medically treated for PKU and the developmental impact of HIV for children/adolescents.

## <u>Clinical Work Experience</u>

## Probation Parole Intervention Evaluator / Group Facilitator
January 2011 – June 2011
Rise Above
King of Prussia, PA 19406
Conducted mental health/drug and alcohol evaluations on clients in Montgomery County Correctional Facility and those on probation or parole for Montgomery County to determine treatment recommendations. Counseled clients in group sessions, to assist in overcoming dependencies, adjust to sober living, and make life changes. Coordinated activities with courts, probation officers, community services and other post-treatment agencies. Maintained records and reports regarding patients' histories and progress, services provided, and other required information.

MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

**Military One Source EAP Consultant**
January 2009 – January 2011
Ceridian
Plymouth Meeting, PA 19462
Provided employee assistance services, resource and referrals and consultation via telephone in a call center environment on various EAP and work/life issues to military service members and their families who are experiencing personal and other problems. Conducted a comprehensive professional assessment of the user's need for core Worklife and/or EAP services. These service options can include: childcare, parenting, eldercare, education, general research, legal, financial, emotional wellbeing, addiction disorders, work issues, and add-on services.

**Outpatient Addiction Counselor / Drug Court Representative**
January 2008 - January 2009
Key Recovery
Ambler, PA 19002
Counseled clients, individually and in group sessions, to assist in overcoming dependencies, adjust to sober living, and make life changes. Coordinated activities with courts, probation officers, community services and other post-treatment agencies. Represented patients currently enrolled in the Montgomery County Drug Court program. Maintained records and reports regarding the patients' histories and progress, services provided, and other required information. Developed client treatment plans based on research, clinical experience, and client histories.

**Inpatient Addiction Counselor**
September 2007 - February 2008
Mirmont Treatment Center
Media, PA 19063
Counseled clients, individually and in group sessions, to assist in overcoming dependencies, adjust to sober living, and make life changes. Provided clients and family members with information about addiction issues and about available services and programs, making appropriate referrals when necessary. Maintained records and reports regarding the patients' histories and progress, services provided, and other required information. Developed client treatment plans based on research, clinical experience, and client histories.

**Alcohol and Drug Abuse Counselor**
June 2006 – August 2007
United States Air Force
RAF Lakenheath, UK
Counseled clients, individually and in group sessions, to assist in overcoming dependencies, adjust to sober living, and make life changes. Coordinated counseling efforts with mental health professionals and other health professionals such as doctors, nurses, and social workers. Coordinated counseling efforts with client's military command and other military resources. Maintained records and reports regarding the patients' histories and progress, services provided, and other required information. Developed client treatment plans based on research, clinical experience, and client histories.

MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

**Traumatic Stress / Crisis Response Coordinator**
2005-2007
United States Air Force
RAF Lakenheath, UK
Provided crisis intervention, traumatic stress / crisis response, safety planning, support, information, critical incident stress management debriefings, trauma prevention trainings, pre and post deployment briefings, and responded to calls immediately and meet with victims as needed.

**Family Special Needs Coordinator**
2004-2005
United States Air Force
RAF Lakenheath, UK
Assisted in the evaluation of families for physical and emotional need, relocating and finding assistance for special needs families, and family special needs coordination. Provided services to soldiers and families to enhance their relationship skills and improve their quality of life through groups, seminars, workshops and counseling and intervention services. Coordinated effort for prevention, education, prompt reporting, investigation, intervention and treatment of spouse and child abuse.

**Neuropsychological Evaluator**
2003-2007
United States Air Force
Keesler AFB, MS; RAF Lakenheath, UK
Conducted neuropsychological, forensic, and psychological evaluations for military members and their families. Administered tests and interpreted the results to check the mental abilities, aptitudes, interests, and personality characteristics of clients. The results of these tests were reviewed with a neuropsychologist to evaluate for educational or vocational selection, guidance or placement, medical evaluation boards, criminal investigations, job qualifications, and other areas of testing as required.

**Mental Health Technician**
2002-2007
United States Air Force
Keesler AFB, MS; RAF Lakenheath, UK
Primary job duties included counseling, addiction treatment, assessments, relocating and finding assistance for special needs families, confidentiality and legal aspects of patient care, combat and disaster casualty care management, critical incident stress management debriefings, working with insurance systems, and other related tasks. Responsibilities included: alcohol and drug abuse treatment, neuropsychological testing, family special needs coordination, traumatic stress / crisis response.

## Military Experience

**Pennsylvania Army National Guard**
March 2022 – Present
Major
73B Army Clinical Psychologist

**United States Air Force**
Active Duty July 2002 – August 2007
Staff Sergeant
Mental Health Craftsman, 4C071
Honorable Discharge

**Medals and Awards**
Air Force Commendation Medal, Air Force Achievement Medal, Air Force Outstanding Unit Award with 2 Oak Leaf Clusters, Air Force Good Conduct Medal, National Defense Service Medal, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, Army Service Ribbon, Air Force Overseas Long Tour Ribbon, Air Force Expeditionary Medal with Gold border, Air Force Longevity Service Award, NCO Professional Military Education Ribbon, Air Force Training Ribbon

## Presentations

Gramatges, M. (2024). *Disease Non-Battle Injury Prevention Training - Behavioral Health*. PA Army National Guard Medical Readiness Detachment Annual Training.

Haggerty, K., Arigo, D., & Gramatges, M. (2016). *Social Comparison Processes among Individuals with Severe TBI: A Longitudinal Pilot Study.* Poster presented at Division 22's Annual Rehabilitation Psychology Conference, Atlanta, GA.

Gramatges, M. (2013). *Substance Use and Traumatic Brain Injury.* Webinar training for Bancroft Brain Injury Rehabilitation.

Gramatges, M. & Haggerty, K (2013). *Blast injuries.* Webinar training for Bancroft Brain Injury Rehabilitation.

Douglas, K., Gramatges, M., & Lindgren, K. (2012). *Brief psychoeducational intervention targeting substance use among individuals with severe traumatic brain injury: a pilot study.* Poster presentation at the 2012 Drexel University Research Day.

## Clinically Related Awards

**Camden County Military Service Medal,** 2011, 2012

**Mental Health Technician of the Year,** Europe 2005

MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

## Professional Affiliations

**American Board of Professional Psychology,** 2011 – present

**American Psychological Association,** 2009 – present

**APA Division 22 Rehabilitation Psychology,** 2011 – present

**Pennsylvania Psychological Association,** 2009 – present

### Expert Testimonies

2024 Cerroni v. Cerroni – In Custody

2024 Commonwealth of Pennsylvania: Alfred Rich Guardianship

2024 Commonwealth of Pennsylvania: Giovanni Matarazzo

2024 United States of America v. Marc Muffley

2024 Marie Simons v. Progressive

2024 Commonwealth of Pennsylvania: William Garrity Guardianship

2023 Dumigan v. McClellan

2023 Commonwealth of Pennsylvania v. Yieheem Furman

2023 Pennsylvania Children and Youth Service Agency DP #65-2020

2023 Commonwealth of Pennsylvania v. Tyler Nikonowicz

2023 Commonwealth of Pennsylvania v. Lawrence Meehan

2023 Commonwealth of Pennsylvania v. Mary Jane Mamenko

2022 Commonwealth of Pennsylvania v. Daniel Williams

2022 Commonwealth of Pennsylvania v. William O'Leary

2021 Levitsky v. Wallingford DCCCP

2020 Commonwealth of Pennsylvania: Karen Tipka Guardianship

2019 Commonwealth of Pennsylvania v. Jesse MacGrath

MG Therapeutic Services LLC
100W 6th St, Suite 305
Media, PA 19063-3228

2019 Commonwealth of Pennsylvania v. Dejohn Lee

2019 Commonwealth of Pennsylvania v. Jeromy Jones

2018 Commonwealth of Pennsylvania: Steve Szyczyk v. Charles McCarthy

2015 Commonwealth of Pennsylvania v. Michael Anthony Paulino

32

**0067A-Walter Reed Natl Mil Med Cntr**
8901 Wisconsin Ave
BLDG 9
Bethesda, MD 20889-5000

(301) 295-4611

| | | | |
|---|---|---|---|
| Patient Name: | **Seferlis, Clift Andrus** | Admit: | 12/31/2025 10:39 EST |
| MRN: | | Discharge: | 12/31/2025 23:59 EST |
| FIN: | | Admitting: | |
| Sex/DOB/Age: | Male          55 years | Location: | 0067A-RAD-MRI-B39 |
| DOD ID (EDIPI): | 1 | Veterans ID (ICN): | |

| *Magnetic Resonance Imaging* |
|---|

| Accession | Exam Date/Time | Exam | Ordering Physician | Patient Age at Exam |
|---|---|---|---|---|
| 00067-MR-25-0020961 | 12/31/2025 11:32 EST | MRI Brain w/ + w/o Contrast | | 55 years |

**Reason for Exam**
(MRI Brain w/ + w/o Contrast) C/F neurocognitive disorder

**Report**



**0067A-Walter Reed Natl Mil Med Cntr**

| | | | |
|---|---|---|---|
| Patient Name: | **Seferlis, Clift Andrus** | | |
| MRN: | ██████████ | Admit: | 12/31/2025 10:39 EST |
| FIN: | 1████████ | Discharge: | 12/31/2025 23:59 EST |
| Sex/DOB/Age: | Male    ██████  55 years | Admitting: | |
| DOD ID (EDIPI): | ████████ | Veterans ID (ICN): | |

### *Magnetic Resonance Imaging*



---

Unless you are the subject of the record, protections under 42 CFR Part 2 and/or 38 U.S.C. 7332 may apply.

33

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES | : | **Case No.: 2:25CR00453-001** |
| | : | |
| v. | : | |
| | : | |
| **CLIFT A. SEFERLIS** | : | **Judge: Hon. Mark A. Kearney** |

### AFFIDAVIT OF JACK DONSON

1. I, Jack Donson, hereby declare under penalty of perjury that the following is true and correct. I submit this Declaration at the request of counsel to provide information relevant to his sentencing.

### STATEMENT OF EXPERTISE

2. I am the Founder of My Federal Prison Consultant, which I started after retiring from a career with the Federal Bureau of Prisons (BOP). I provide consulting, training and expert witness testimony on federal prison issues. I have worked directly with federal offenders for over 37 years and have testified in district courts throughout the country. I am also the executive director of a non-profit organization called the Federal Prison Education and Reform Alliance-PERA. We provide training, education and support to the federal justice community, so they have a better understanding of BOP policy and process for representation and advocacy.

3. I was employed by the BOP for twenty-three years working with staff and inmates in security classification, correctional programs and treatment. I actively follow policy initiatives and routinely attend training conferences, including the U.S. Sentencing Commission conference, which includes a presentation by BOP staff on current prison issues. I am a member of both the American Bar Association (ABA) and National Association of Criminal Defense Lawyers' (NACDL) corrections committees. I have authored articles and book chapters on federal prison matters in national print media, legal periodicals and ABA publications.

4. During my career, I worked directly with inmates and trained staff as a Correctional Treatment Specialist (case manager & case management coordinator). I completed hundreds of training courses including basic and advanced case management training and leadership related courses. I had full-time collateral administrative responsibilities including an instructor in annual and specialized training for case management staff, mentoring, local policy writing, conducting facility audits, and overseeing institutional programs. I have worked in minimum (camp), low, medium, administrative (pre-trial and high security), and Witness Security (PCU) units. On several occasions, I was assigned to the BOP Philadelphia Regional Office (NERO) and the New York City Community Corrections Office (TDY). I have expertise with U.S. Parole Commission policy and BOP sentence computations. Prior to working for the federal government, I was

employed in the Commonwealth of Pennsylvania as a Probation & Parole Officer where I wrote pre-sentence investigations, supervised the work release program and managed a caseload of adult and juvenile offenders.

5. My skillset is unique, policy-focused, and has been molded by my regular interaction with BOP staff and administrators as well as inmates in the trenches of the federal prison system. This interaction has continued during my retirement through daily contacts with attorneys, non-governmental organizations, and email correspondence with incarcerated people from around the prison system. In my role with FedCURE as their National Director for Inmate Programs and Services, I regularly interacted with BOP central office staff regarding prison issues and was solicited for feedback on legislation such as the First Step Act. I have conducted First Step Act related training for the NACDL, AOUSC and federal defender organizations. I have been invited to attend meetings with the GAO regarding the First Step Act and the DOJ for the Access to Justice and federal prison oversight initiatives.

6. I have been qualified as an expert witness several dozen times in accordance with Federal Rule 702 (Daubert Standards). I have never been denied the ability to testify as an expert witness on BOP related issues.

7. I hold a bachelor's degree in Sociology/Anthropology and a Master of Science Degree in Criminal Justice. Aside from consulting, I was a Lecturer at Marywood University for several years and taught Criminal Justice courses, including one entitled The American Prison. A true and correct copy of my *Curriculum Vitae* is attached.

8. I have personal knowledge of the facts stated herein and can testify competently thereto if called as a witness in this matter.

### SCOPE OF REVIEW

9. I have been asked to provide my professional opinion regarding Mr. Seferlis's classification and the available rehabilitative programs within the Federal Bureau of Prisons based on his needs. I have reviewed the sentencing memorandum and PSR and offer my professional opinion form a BOP correctional treatment perspective.

### SUMMARY OF FINDINGS

10. While Mr. Seferlis meets the profile of a white-collar offender, he will not be housed in a minimum-security federal prison "*camp*" based on the classification policy. The BOP policy requires the assignment of a "*public safety factor*" due to the instant offense behavior which precludes minimum security placement. It is unlikely the BOP would waive the PSF based on the offense behavior, so he will be housed with inmates serving sentences of more than ten years, sex offenders  and others with more of a criminal orientation. In addition, he has minimal correctional treatment needs as far as rehabilitation aside from mental health counseling which will be nearly non-existent, aside from crisis intervention, given the BOP's staffing crisis in medical and psychology services.

2

## SECURITY CLASSIFICATION (BRAVO) AND "MANAGEMENT VARIABLES"

11. The BOP classifies facilities into several categories including minimum security (camp), low and medium security (FCI's), high security (USP) and administrative (MCC/MDC/FDC & Medical Centers). The inmate classification tool is known as "BRAVO" (Bureau Risk Assessment Verification and Observation).

12. Some of the factors used in BOP classification include age, criminal history points, history of violence and/or escape and characteristics of the instant offense. Each factor has a corresponding point value, which are totaled to determine an overall security level and facility placement. Below is a chart based on the BOP classification manual (CPD/CPB, Number P5100.08, Inmate Security Designation and Custody Classification).[1]

| Security Level | Male | Female |
|---|---|---|
| MINIMUM | 0-11 Points | 0-15 Points |
| LOW | 12-15 Points | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| HIGH | 24 + Points | 31 + Points |

13. Security points alone do not determine the level as BOP policy includes other "*public safety factors*" (PSFs) that can elevate a security despite the security score. Mr. Seferlis will have one PSF due to the instant offense being of the greatest severity and that will preclude the designation to a minimum-security facility. I have estimated Mr. Seferlis will have four (4) security points which is ordinarily commensurate with minimum security, however, the public safety factor increased his security level by one level to low security. (See exhibit one)

14. Notably, the classification policy also has what are referred to as "*management variables*" that allows the BOP the discretion to designate offenders to a facility below their scored security level for various penological purposes. In my experience, it is unlikely they would assign a management variable in this case given the offense behavior. In the cases that I have seen waived, it is only during the period of incarceration after staff have had the opportunity to observe a person's behavior. The only way it would be considered at initial designation is if the court were to make a specific recommendation for the waiver.

---

[1] https://www.bop.gov/policy/progstat/5100_008cn.pdf

3

## MENTAL HEALTH CLASSIFICATION and TREATMENT

15. From a medical/clinical classification perspective, all inmates are assigned a provisional medical classification for both physical and mental health during the designation process. It is a four-level system referred to as "*Care Levels*"[2] which are explained in Program Statement # 5310.016, <u>Treatment and Care of Inmates with Mental Illness</u> and a BOP care level clinical guide as indicated below[3]:

   (1) CARE1-MH: No Significant Mental Health Care. An individual is considered to meet CARE1-MH criteria if he/she:

   ■ Shows no significant level of functional impairment associated with a mental illness and demonstrates no need for regular mental health interventions; and
   ■ Has no history of serious functional impairment due to mental illness or if a history of mental illness is present, the inmate has consistently demonstrated appropriate help-seeking behavior in response to any reemergence of symptoms.

   (2) CARE2-MH: Routine Outpatient Mental Health Care or Crisis-Oriented Mental Health Care. An individual is considered to meet CARE2-MH criteria if he/she has a mental illness requiring:

   ■ Routine outpatient mental health care on an ongoing basis; and/or
   ■ Brief, crisis-oriented mental health care of significant intensity; e.g., placement on suicide watch or behavioral observation status.

   (3) CARE3-MH: Enhanced Outpatient Mental Health Care or Residential Mental Health Care. An individual is considered to meet the criteria for CARE3-MH if he/she has a mental illness requiring:
   ■ Enhanced outpatient mental health care (i.e., weekly mental health interventions); or
   ■ Residential mental health care (i.e., placement in a residential Psychology Treatment Program).

   (4) CARE4-MH: Inpatient Psychiatric Care. A mentally ill inmate may meet the criteria for CARE4-MH and require acute care in a psychiatric hospital if the inmate is gravely disabled and cannot function in general population in a CARE3-MH environment.

16. It is likely that Mr. Seferlis will be determined to be CARE1 for his physical health and no greater than CARE2 for his mental health. The PSR reflects he has been involved with individual weekly counseling which he will not get in the BOP aside from if there is a mental health crisis. CARE2s will meet with a clinician monthly at best and it will be brief and cursory. This is concerning because facilities are not staffed with clinical resources for regular individual psychotherapy unless a person's mental health care level is elevated due to a crisis or severe mental illness. The BOP is currently undergoing an historical staffing

---

[2] https://www.bop.gov/policy/progstat/5310_016_cn-1.pdf
[3] https://www.bop.gov/resources/pdfs/care_level_classification_guidance_102025_final.pdf

crisis which has particularly impacted clinical positions. As recently as February 20, 2026, the House Committee on the Judiciary sent a letter to the BOP Director which indicated in part:

"*We are deeply concerned that these developments compromise the safety and security of both inmates and staff. The shrinking existing workforce has been left to contend with an ever-growing use of overtime, which leads to fatigue, burnout, and increased attrition. Insufficient staffing levels have led to lockdowns, heightening tensions among inmates, increasing instances of violence, limiting access to recidivism-reducing programming, further restricting the availability of medical and mental health care, and hindering institutional response to institutional emergencies such as assaults and suicide attempts.*"

17. While the BOP attempts to maintain a continuity of clinical care, it is highly unlikely the agency can meet that standard in this case. While there are group programs on various mental health issues, the staffing shortages have caused extensive waiting lists. I have recently seen several inmates on program waiting lists going back to 2022.

## CORRECTIONAL TREATMENT PROGRAMS

18. One of the major purposes of incarceration is rehabilitation. Under the First Step Act (FSA), staff identify the needs of offenders in a tool referred to as the SPARC-13 (Specialized Prisoner Assessment for the Reduction in Criminality). Out of the thirteen needs contained in the assessment, it is my professional opinion that Mr. Seferlis meets one of thirteen which is called "*Mental Health*." The remaining twelve are: Anger, Anti-social Peers, Cognitions, Dyslexia, Parenting, Education, Poverty, Substance Abuse, Trauma, Medical, Work, & Recreation/Fitness.

19. Based on a review of the PSR Mr. Seferlis has minimal correctional treatment needs and the one that he has is being addressed in the community in a far more meaningful and productive way than it would in the current federal prison setting.

## CONCLUSION

20. Mr. Seferlis meets a profile that will have challenges in a secure federal correctional institution where he will be housed with offenders with longer sentences and more extensive criminal histories. The BOP will not be able to meet the continuity of his community mental health treatment there would be minimal additional correctional treatment needs. The court imposes a custodial term, it would be practical for the court to request the BOP apply an appropriate management variable given that he is more appropriate for a minimum-security environment given his age, lack of prior prison experiences, violence or criminal history. While any recommendations made by the court are non-binding on the agency, they will be seriously considered and will apply the appropriate discretion. The BOP has historically tracked the compliance rate at over 70 %. Therefore, it would be practical for the court to provide a more targeted judicial recommendation for his designation to ensure the safest environment.

5

21. Suggested language for the court would be: *"The court recommends the designation to a minimum-security federal prison camp and does not object to the assignment of a lesser security management variable at the BOP's discretion given the defendant's age, lack of prior prison experiences, violence or criminal history. If the BOP determines a secure facility is necessary, FCI Petersburg, VA is recommended.*

Executed on this 9th day of March 2026

Jack T. Donson, President and Founder _____

6

BP-A0337
JUNE 10

**INMATE LOAD AND SECURITY DESIGNATION** CDFRM

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

---

## INMATE LOAD DATA

| 1. REGISTER NUMBER: | | | | |
|---|---|---|---|---|
| 2. LAST NAME<br>SEFERLIS | 3. FIRST NAME<br>Clift | | 4. MIDDLE<br>A | 5. SUFFIX |
| 6. RACE<br>C | 7. SEX<br>M | 8.ETHNIC ORIGIN<br>NH | 9. DATE OF BIRTH<br>05/29/2970 | |

| 10. OFFENSE/SENTENCE |
|---|
| 18 U.S.C. § 876(c), 18 U.S.C. § 247(a)(2) and (d)(5) & 18 U.S.C. § 247(a)(2) and (d)(3) |

| 11. FBI NUMBER<br>N51MHPJW3 | 12. SSN NUMBER |
|---|---|

| 13. STATE OF BIRTH<br>DC | 14. OR COUNTRY OF BIRTH | 15. CITIZENSHIP<br>US |
|---|---|---|

| 16. ADDRESS-STREET |
|---|

| 17. CITY<br>Garrett Park | 18. STATE<br>MD | 19. ZIP | 20. OR FOREIGN COUNTRY |
|---|---|---|---|
| 21. HEIGHT<br>FT        IN | 22. WEIGHT<br>LBS | 23. HAIR COLOR | 24. EYE COLOR |

| 25. ARS ASSIGNMENT: |
|---|

## SECURITY DESIGNATION DATA

| 1. JUDGE<br>Hon. Bruce Howe Hendricks | 2. REC FACILITY | 3. REC PROGRAM | 4. USM OFFICE<br>D/SC |
|---|---|---|---|

| 5. VOLUNTARY SURRENDER STATUS | 0 = NO        (-3) = YES | |
|---|---|---|
| IF YES, MUST INDICATE: | 5a. VOLUNTARY SURRENDER DATE: | -3 |
| | 5b. VOLUNTARY SURRENDER LOCATION: | |

| 6. MONTHS TO RELEASE : |
|---|

| 7. SEVERITY OF<br>CURRENT OFFENSE | 0 = LOWEST<br>1 = LOW MODERATE | 3 = MODERATE<br>5 = HIGH | 7 = GREATEST | 7 |
|---|---|---|---|---|

| 8. CRIMINAL HISTORY<br>SCORE | 0 = 0-1<br>2 = 2-3 | 4 = 4-6<br>6 = 7-9 | 8 = 10-12<br>10= 13 + | 0 |
|---|---|---|---|---|
| 8a. SOURCE OF DOCUMENTED | - PRESENTENCE INVESTIGATION REPORT or | | - NCIC III | |

| 9. HISTORY OF<br>VIOLENCE | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | 0 |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 3 | 5 | |
| | SERIOUS | 0 | 2 | 4 | 6 | 7 | |

| 10. HISTORY OF<br>ESCAPE OR<br>ATTEMPTS | | NONE | >15 YEARS | >10 YEARS | 5-10 YEARS | <5 YEARS | 0 |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 2 | 3 | |
| | SERIOUS | 0 | 3(S) | 3(S) | 3(S) | 3(S) | |

| 11. TYPE OF<br>DETAINER | 0 = NONE<br>1 = LOWEST/LOW MODERATE | 3 = MODERATE<br>5 = HIGH | 7 = GREATEST | 0 |
|---|---|---|---|---|

| 12. AGE | 0 = 55 and over<br>2 = 36 through 54 | 4 = 25 through 35<br>8 = 24 or less | 0 |
|---|---|---|---|

| 13. EDUCATION<br>LEVEL | 0 = Verified High School Degree or GED<br>1 = Entrolled in and making satisfactory progress in GED Program<br>2 = No verified High School Degree/GED and not participating in GED Program | 0 |
|---|---|---|
| 13.a HIGHEST GRADE COMPLETED | | |

| 14. DRUG/ALCOHOL ABUSE | 0 = NEVER/>5 Years | 1 = <5 Years | 0 |
|---|---|---|---|

| 15. SECURITY POINT TOTAL | 4 |
|---|---|

| 16. PUBLIC<br>SAFETY<br>FACTORS | A-NONE<br>B-DISRUPTIVE GROUP (males only)<br>C-GREATEST SEVERITY OFFENSE (males only)<br>F-SEX OFFENDER<br>G-THREAT TO GOVERNMENT OFFICIALS<br>H-DEPORTABLE ALIEN | I-SENTENCE LENGTH (males only)<br>K-VIOLENT BEHAVIOR (females only)<br>L-SERIOUS ESCAPE<br>M-PRISON DISTURBANCE<br>N-JUVENILE VIOLENCE<br>O-SERIOUS TELEPHONE ABUSE | C |
|---|---|---|---|
| | | | / |
| | | | / |

| 17. REMARKS<br>Low security (4 points) Ineligible for minimum security camp due to the public safety factor. |
|---|

| 18. OMDT REFERRAL (YES/NO)        n |
|---|

---

FILE IN SECTION 2 UNLESS APPROPRIATE **EXHIBIT ONE** FOLDER        **SECTION 2**

34



Jack Thomas Donson
Email: jack@bopera.org
Telephone (212) 461-2252 B.
(570) 687 6829 C. (Preferred)

**Personal Information**
Education: BS-Sociology/Anthropology,
MS-Criminal Justice

**Personal Statement**

I have worked directly with incarcerated people for over 38 years at the county, state and federal levels. I educate and support the federal justice community on BOP policy and process to obtain better outcomes in representation, advocacy and legislation. In 2011, I retired from the BOP and founded "_My Federal Prison Consultant_", LLC, after witnessing decades of exploitation of incarcerated people and families by high priced and uninformed prison consultants. This exploitation has exacerbated under the First Step Act because the lack of BOP transparency and accountability fosters exploitation.

Most of my career, I managed caseloads within the trenches of the prison system as a Correctional Treatment Specialist.  I also served in administrative capacities (CMC/Unit Manager/Camp Administrator). I have conducted facility audits, participated in policy writing work groups, oversaw programs and trained case managers in classification and correctional programs. My perspective is unique and derived from directly applying policy in various prison environments including Pre-trial ( administrative/high security), Minimum, Low, Medium, & Witness Security units. I received three national awards during my career and over thirty other performance awards.

After twelve years in the private sector working with families and justice professionals, I saw a profound need for a more educated justice community regarding BOP issues. I recently formed The Federal Prison Education and Reform Alliance (501C3) and serve as the Executive Director. The organization intends to be the primary stakeholder focused solely on BOP issues while also supporting people in prison.   Our organization has already conducted training around the country for Federal Defenders, Judges and the Administrative Office of the US Courts.

I have served pro bono for several non-profit organizations helping marginalized populations and their families navigate the prison system. (FedCURE/Out4Good/Choosing Integrity) I am a member of the Corrections Committees of the National Association of Criminal Defense

Lawyers (NACDL) and the American Bar Association (ABA). I have testified in federal district courts throughout the United States and the United Kingdom. I was a lecturer at the university level and have taught several courses including one entitled "The American Prison."

My most rewarding government contract work as an expert is supporting post-conviction petitions by submitting formal declarations and testifying for juvenile and young adult lifers sentenced in the D.C. Superior Court regarding the Incarceration Reduction Amendment Act (IRAA) and Second Look Act.

My passion is federal prison reform, and my mantra is that many proactive reforms can be accomplished under the existing policy and statutory framework through leadership, accountability and transparency. I have a pulse on the agency from working on both sides of the system and my knowledge of BOP policy, process and culture is extraordinary.  My analytical ability in combination with my practical experience provides me with insights which is advantageous for clients, attorneys, legislators, the media and reform organizations. I have appeared on several national television and radio programs as a commentator and have been quoted in national print media. I have authored  chapters in two ABA Books on mental health issues and articles in the Federal Sentencing Reporter, The Hill as a  "Opinion Contributor" and Bloomberg Law Insights as an "Outside Editor."

## Current Work Experience

***The Federal Prison Education and Reform Alliance-*** Executive Director -Non-profit providing education and support to the federal justice community and direct services to the incarcerated. July 26, 2023-Present  www.bopera.org

***My Federal Prison Consultant***, *LLC*- President& Founder, supports counsel, clients and families on both technical policy issues and general prison support on all areas of the BOP. I testify around the country on BOP issues relevant to mitigation. July 2011-Present www.mfpcllc.com

## Prior Work Experience

***Prisonology***, VP- Operations & Co-founder, Consulted, testified and developed CLE's which were delivered to federal defenders, judges and CJA panel attorneys. September 2014- Feb. 2022.

***FedCURE***, Director of Programs and Case Management Services, Assist the incarcerated and their families relative to federal prison issues, pro bono via a designated BOP liaison in the central office. July 2011- June 30, 2023. www.fedcure.org  (volunteer)

***Out4Good,*** *LTD,* Executive Director- In charge of developing the "Correcting Corrections in America initiative", April 2013 to April 1, 2024.  Stepped down to a regular board member position to focus on PERA.    www.out4good.org

***Marywood University****,* Lecturer PA- Criminal Justice Professor- courses entitled: "Community Corrections," "Shadow and Service" and "The American Prison."  January 2013-January 2019

***Federal Bureau of Prisons***, <u>Correctional Treatment Specialist</u> & <u>Case Mgt. Coordinator</u>- I was responsible for the counseling, classification, inmate discipline and re-entry. I coordinated institution programs and trained staff in classification & correctional programs.

- Special expertise working with high profile organized crime figures, the Witness Protection (WITSEC) program & white-collar crime offenders.
- Alternate Case Management Coordinator 1991 to 2011
- Assignments (TDY) in the Regional Office, Philadelphia, PA. (CIM Coordinator/Correctional Programs), New York City Community Corrections Office (processing designations and halfway house referrals) & several National (DC) policy writing work groups.
- Annual Training Instructor in the areas of security designation/classification, Central Inmate Monitoring (CIM,), FOIA/Privacy Act & Victim Witness program.
- Member of Hostage Negotiation Team
- Received 3 National Awards for Excellence in Administration & Detention Procedures, National Correctional Treatment Specialist of the Year & Excellence in Training Award.
- Taught Institution familiarization orientation to new staff & was assigned as a mentor for college interns and newly appointed case managers and counselors.
- Held assignments as Camp Administrator, Case Management Coordinator, Unit Manager and Assistant Case Management Coordinator.
- Liaison for US Parole Commission, US Marshals, FBI and ICE
- Worked in minimum, low, medium, administrative (including high security) & Witness Security (WITSEC) units.

***Commonwealth of Pennsylvania,*** <u>Probation and Parole Officer</u>- Supervised a caseload of adults and juveniles. Appeared in court on a weekly basis, prepared pre-sentence reports, submitted parole recommendations to the court, provided community supervision of offenders and managed the work release and ARD programs. ( Internship with Scranton District Office of the PA Board of Probation and Parole).

 **Army National Guard,** (E-5) Easton, PA 1986-1995
- **Military Police** (MP-95 Bravo), Ft. McClellan, AL
- **Stinger Missile Gunner** (16 Sierra), Ft. Gordon, Ga.

**Education**

Marywood University, Scranton, Pennsylvania
- **Master of Science in Criminal Justice** 1997 (Concentration in Public Administration)

East Stroudsburg University, East Stroudsburg, Pennsylvania
- **Bachelor's Degree in Sociology/Anthropology** 1985

**Awards**
- 1998 National Community Corrections Award

- 1990 National Correctional Treatment Specialist of the Year
- 1991 National Excellence in Annual Training Award
- I received thirty-two other monetary personal achievement awards.

**Other Activities/memberships**

***Choosing Integrity***, Board Member (2018-2025) https://www.choosingintegrity.org/about/

- Testified on Capitol Hill to the Colson Task Force on Federal Corrections
- AOUSC Trainer -Defender Investigator and Paralegal Seminar-Houston TX Winning Strategies Seminar-BOP Mental Health-Austin, TX
- Authored Article on BOP Restrictive Housing in the Federal Sentencing Reporter
- Authored Chapter's in ABA Publications on Autism Spectrum Disorders (2019) & Suicide and Its Impact on the Criminal Justice System (2021)
- Regularly provides training on federal prison issues to federal defenders, Judges & for the AOUSC
- Numerous National media outlet appearances for commentary (CNBN/Fox/CNN)
- NACDL Corrections Committee since 2011
- ABA Corrections Committee 2012- Chaired Standing sub-committee on BOP Policy
- Monthly contributor to the Sentencing Partners Newsletter from Joaquin & Duncan
- Finance Committee Chair-United Methodist Church
- Authored OP Eds in The Hill regarding BOP issues
- Member of the U.S. Ombudsman Association (USOA)
- Member of the PA Prison Society
- Overall offender advocacy & general federal prison & legislative reform efforts
- Hiking, Fishing, Leisure Travel

# References, testimonials and award letters are available upon request.

## <u>CERTIFICATE OF SERVICE</u>

I, Margaret M. Grasso, Esquire, certify that I have delivered a copy of Defendant's Sentencing Memorandum to Assistant United States Attorneys Mark B. Dubnoff and Taylor Payne by electronic mail.

**LAW OFFICE OF MARGARET M. GRASSO**

*Margaret M. Grasso*

**MARGARET M. GRASSO, ESQUIRE**
**Attorney for Defendant Clift Seferlis**

March 9, 2026